DAVID BARNUM AND AUGUSTUS KIRBY BARNUM, Infants, by their next friend, *vs.* ZENUS BARNUM, ANDREW McLAUGHLIN AND OTHERS.

WILL,—CONSTRUCTION OF: POWERS: TRUSTS: PERPETUITIES: GENERAL AND SPECIAL POWERS.—The will of David Barnum empowered and directed the trustees therein named to lease his hotel property and to apply the rents, &c., as therein provided. The period for which the leasing is authorized and directed. is thus stated in the will: "And the period during which my trustees, and their heirs and successors, shall have the power and are required to lease as aforesaid, shall be so long as my said children, or any children or descendants. of them, or any of them, left by them, or any of them, at the death of them, or any of them, shall live; it being understood that any lease made during the . period aforesaid, shall have full effect, and continue for its stipulated term, notwithstanding the cessation of all of said lives before the end of the term."— HELD:

1st. That under these provisions the period for continuing the trust or power to lease *may* extend so as to embrace persons and lives not *in esse* at the time of the testator's death,—descendants *born after that event.*

2nd. If an estate be so limited as by possibility to extend beyond a life or lives in being at the time of its commencement, and twenty-one years and a fraction of a year (to cover the period of gestation) afterwards, during· which time the property would be withdrawn from the market or the power over the fee suspended, it is a perpetuity, and void as against the policy of the law, which will not permit property to be inalienable for a longer period.

3rd. That the execution of the trusts for leasing the hotel property, and performing the duties enjoined upon the trustees, being made to cover a period beyond that allowed by law, during which time the said property, real and personal, is placed *extra commercium,* the devise in trust is therefore void.

4th. That if the trust be void, then the power to lease, which is blended with it, in this case, must be void also; it is not a mere power, distinct from the trust, leaving the act to be done at the will of the party to whom it is given, but it is mixed and blended with the trust, and its execution is as imperative as the trust itself.

5th. The general principle is, that every power, the direct object of which is to create a perpetuity, is absolutely void; the exceptions to the rule arise out of the distinction between general and limited or special powers. But in every case, the execution of the power being distinct from the power itself, must conform to the requisition of the rule against perpetuities, or run the hazard of being avoided.

6th. Where a power is itself valid in not transgressing the rule, the donee, in executing it, may go beyond the proper boundary. Equity in such case, being guided by the power, will treat the excess as surplusage and vodi, but only where the portion which exceeds the boundary of perpetuity be definite and ascertained, or can be rendered so.

7th. In this case the limitation is in the instrument itself, creating the trust or

power, and no one can declare with certainty how the dispositions of the testator would have been regulated if he had been aware at the time of his inability to extend them to some included in his gifts. The whole is therefore vitiated by the excess.

8th. The trusts being void *in toto*, the legacies springing out of them must also be regarded as void; and the power to lease being void, the right to share in the distribution of the rents must necessarily fail.

WILL,—CONSTRUCTION OF: JURISDICTION AND PRACTICE IN EQUITY.—A further provision of said will was as follows : "Should my views in the above first article of this will be disappointed, so that judicially or otherwise, a sale should take place of said City Hotel buildings and grounds, during the life of my children, it is my will, and I direct that my trustees, or any Court of Equity, shall cause the proceeds of sale to be invested in mortgage or ground-rents, or in debt of the United States or of the city of Baltimore; and that subject to the payment of one-third of the income of the investment to my wife during her life, the said investment shall be for the benefit of my children during their lives, and after their deaths, shall be the property, for the shares of the decedents, of their respective children or descendants, *per stripes ;* the children or descendants of such of my children as shall have died before the investment, taking as their absolute property, and *per stripes* the shares to which, if they had lived, the deceased would have been entitled." HELD :

1st. The inference is strong, if not irresistible, that the testator had in contemplation a probable sale, resulting from the failure of the first article by reason of its invalidity.

2nd. That in providing this alternative disposition of that portion of his estate, it is not likely that the testator would ground his bequests upon an actual precedent sale as a condition, when a state of things might arise leading to a sale, or proceedings be instituted that would result in one. In either or any of these events, his views as contained in the first article would be equally disappointed.

3rd. That the words, "a sale shall take place," in this clause, have the same meaning as if the testator had said, "so that judicially or otherwise a sale is to take place."

4th. That equity treats as done that which ought to be done; that if upon the failure of the first article, parties became entitled to the proceeds of sale when effected, they would have a right to resort to a Court of Equity for a sale which would produce those proceeds. That, in substance, the will is the same as if it directed a sale to take place in case the views in the first article could not be carried out.

5th. That the first clause of the will of the testator being void, and his purposes therein declared having been disappointed, the second clause becomes operative, and the complainants are entitled to relief.

APPEAL from the Circuit Court for Baltimore city.

This is an appeal from a decree of the Circuit Court of

Baltimore city, (KREBS, J.,) dismissing the bill of complaint filed in that Court by the appellants, infants, by next friend, against the appellees. The appellants are the children of Augustus Barnum, deceased, who was one of the children of David Barnum, deceased. The object of the bill is to obtain a construction of the will of said David Barnum, and the complainants claim a decree for a sale of certain fee-simple estates and leasehold and personal property, constituting Barnum's City Hotel and furniture, in the city of Baltimore, and an account of the rents and profits thereof accrued since the death of their father. A full statement of the case is made in the opinion of this Court.

The cause was argued before BOWIE, C. J., and BARTOL, GOLDSBOROUGH, COCHRAN and WEISEL, J.

*E. Otis Hinkley* for the appellant argued :

I. That an estate created by the execution of a power takes effect as if it had been limited expressly in the instrument creating the power. Hence, a power in reference to the time of the execution thereof, and to the estates or interests thereby attempted to be created, must be governed by the same rule against perpetuity which prevails in regard to the limitation of estates. 4 *Kent's Comm.*, 337. 1 *Sugden on Powers*, 498, 474, 475. 2 *Ibid.*, 22, 24. 1 *Jarman on Wills*, 248. *Lewis on Perpetuities*, ( 52 *Law Lib.*,) 485 *to* 494, 488, 489.

II. That the power (erroneously so termed) to lease the premises, and to collect and distribute the rents thereby to be realized, so long as any child of the testator, and any child or descendant of any such child left at the death of any child shall live, and until the expiration of the lease for ten years, which shall be running at the time of the death of the last survivor of such children and descendants, is simply void as tending to a perpetuity, or if not alto-

gether void, would be incapable of execution after the expiration of all the lives in being at the time of the testator's death, and twenty-one years thereafter. If void in part, the views of the testator would *pro tanto* be disappointed, and the *casus* arises which was anticipated by the second article of the will.

The time limited by the perpetuity rule is "lives in being and twenty-one years and a fraction." *Cadell vs. Palmer*, 7 *Bligh. N. S.*, 202. 1 *Clark & Finnelly*, 371. 4 *Kent*, 271. *Newton vs. Griffith*, 1 *H. & G.*, 115 and 125. *Hoxton vs. Archer*, 3 *G. & J.*, 212. *Biscoe vs. Biscoe*, 6 *G. & J.*, 235. *Dashiell vs. Attorney General*, 5 *H. & J.*, 392. *Torrance vs. Torrance*, 4 *Md. Rep.*, 11. *Smith vs. Clark*, 10 *Md. Rep.*, 194.

Mr. Barnum's will creates a trust and not a power. *Marlborough vs. Godolphin*, 1 *Eden*, 404, 415, 419. 1 *Sugden on Powers*, 178, 129, 154. 2 *Ibid.*, 162, 158, 160. 1 *Jarman on Wills*, 248. *Lewis on Perpetuities*, 485 and 486. The distinction is important, because equity never aids the non-execution of a mere power. 2 *Sugden on Powers*, 28.

III. The judge below, on the authority of cases referred to in his opinion, supposes that if an estate is limited in strict settlement, and a power is conferred on trustees to sell or lease during the life of the tenant for life, or the minority of any tenant in tail, such power will not affect the validity of any of the estates limited, and that it may be validly executed during the life estate. Lord ELDON thought that such power tended to a perpetuity as it might possibly continue for centuries, and, therefore, that the power was void *ab origine*. *Ware vs. Polhill*, 11 *Ves.*, 283. 2 *Sugden on Powers*, 467.

Lord ELDON's opinion sustains, therefore, our preceding propositions. Assuming that the more recent cases referred to in the Court below have overruled or questioned Lord ELDON's opinion to this extent, that the power may be

executed within the term of any life in being at the death of the testator, and twenty-one years thereafter, it may nevertheless be confidently affirmed :

1. That it has never been adjudged that the power may be executed after the expiration of that term.

2. The reason assigned in support of the power is, that the power is collateral to, or appendant on the estate, and is terminable at any moment by any act determining the estate to which it is attached. It is supposed, in short, that the power is intended to effect no more than a modification in the form of enjoyment of the estate, and cannot tend to a perpetuity where the estate with which it is associated is validly created. 2 *Jarman on Wills*, 729. *Wallis vs. Freestone*, 10 *Simon*, 225, expressly places it on this ground. 1 *Sugden on Powers, Introduction, p. XII.* Waiving all discussion as to the sufficiency of this reasoning when limited to a case where the person beneficially interested has an estate distinct and independent on the power, and to the enjoyment of which the exercise of the power is not essential, and by the alienation of which the power may be destroyed, it can have no application in a case where the person to whom the estate or trust is limited has no control over the execution of the power by the grantee thereof, and where the power is not exhausted by a single act, but is to be exercised continuously during the continuance of the estate or trust, and through a term which exceeds in duration the limits prescribed by the law against perpetuities. In this last case supposed, the rule of Lord ELDON is clearly applicable ; and it was accordingly held by Sir WILLIAM GRANT, in *Leake vs. Robinson*, 2 *Merivale*, 383, that where a trust was created for accumulation with a view to distribution amongst the individuals of a class as they should arrive at their respective ages of twenty-five years, the entire trust was void, although some persons of the class had attained the age of twenty-five years within

the term prescribed by law. And overlooking the inter-mediate cases, which, with an unbroken unanimity, sustain *Leake vs. Robinson*, the Vice Chancellor, in *Ferrand vs. Wilson*, 4 *Hare*, 376, treats the limitation of an estate, and a power or trust to accumulate or apply rents and profits, as equally void where the estate in the first instance may not take effect, and the person for whom the fund is destined in the second instance may not come into existence until a period after the testator's death, more remote than is allowed by law. 2 *Sugden on Powers*, 65. *Porter vs. Fox*, 6 *Simon*, 492. *Cowport vs. Austen*, 12 *Simon*, 250. *Ibbetson vs. Ibbetson*, 10 *Simon*, 495. *Browne vs. Stough-ton*, 14 *Simon*, 369. *Dungannon vs. Smith*, 12 *Clark & Finnelly*, 546, and 634 and 640. *Southampton vs. Here-ford*, 2 *Vesey & Beames*, 54. *Boughton vs. James*, 1 *Col-lyer*, 26. General and particular powers distinguished. *Lewis*, 483 and 484, 522. 1 *Jarman*, 250. 2 *Do.*, 729. 1 *Sugden*, 472, 473 and 474. 2 *Do.*, 471. *Merlin vs. Blagrave*, 25 *Beav.*, 133. *Seaman vs. Ward*, 22 *Id.*, 595. *Thomas vs. Wilberforce*, 31 *Id.*, 302. *Ward vs. Barrow*, 2 *Ohio*, ( *N. S.*,) 241. *Amory vs. Ford*, 5 *Seld.*, 403.

Now in the case before us, the "estate," as it is termed, is eliminated out of what is termed the "power." The beneficial enjoyment of the estate is dependent altogether on the exercise of the power. There is no gift other than is to be found in the direction to pay over the rents and profits realized by the exercises of the leasing power. The property is given to trustees, not to those who are treated by the Court as the *cestui que trusts*. The trustees are directed to lease the property for hotel purposes, and cannot use or employ it in any other manner. They are to distribute the rents realized by the leases to be made by them, and no provision is made for the distribution of profits to arise in any other manner. And the estate limited to the trus-tees is to continue, and the power of leasing delegated to

them is to be exercised, and the distribution of the fruits realized by the exercise of this power is to be made period-ically, as they arise, and continuously for and until the end of a term which may endure beyond the limits defined by the law, and for the subsistence of persons constituting for the time being the "family" of the testator.

The purpose of the testator in those provisions of the will, or as he has expressed it, his "view," is one and in-separable, and the various provisions are dependent one on the other. If the estate devised to the trustees is incapa-ble of continuance, for and during the entire term, it is void *ab initio*. If the estate of the trustees is avoided, their supposed power of leasing is at an end, and with that power, the right of the "family" to share in the distribu-tion of the rents to be realized from the exercise of the power. 4 *Kent*, 271. *Coster vs. Lorillard*, 5 *Paige Ch.,* 172 and 225. *Same Case on Appeal*, 14 *Wendell*, 265 and 392. *Root vs. Stuyvesant*, 18 *Wendell*, 257. *St. Amoun vs. Rivaud*, 2 *Michigan (Gibbs,)* 294. *Hawley vs. James*, 16 *Wendell*, 61 and 251. *Van Vechten vs. Van Vechten*, 8 *Paige Ch.*, 104 and 121. *Moneypenny vs. Dering*, 16 *Meeson & Welsby*, 418. *Lewis on Perpetuities*, (52 *Law Lib.*,) 129, 159, 164, 169, 170, 430, 453, 433, 454, 441, 457, 485. *Supplement to Lewis on Perpetuities*, (66 *L. L.*,) 151, 152, 154.

As the *cy pres* doctrine creates *estates tail*, *quære* whether it is any longer applicable in Maryland since the Act of 1786, ch. 45, of descents, 1782, ch. 23, to bar entails, and the New Code, titles "Inheritance" and "Conveyancing," because now estates tail might descend even to collaterals very remote, and so the reason of the rule would utterly fail. *Newton vs. Griffith*, 1 *H. & J.*, 127 and 132. *Wells vs. Biscoe*, 2 *G. & J.*, 458 and 467. Ground of *cy pres* doctrine stated in 1 *Jarman on Wills*, 261. 2 *Sugden on Powers*, 61.

IV. That the distribution ordered by the first article of the will is to be made—1. To and amongst the children of the testator during their respective lives,—to each child an aliquot share or proportion of the fund.

2. Upon the death of any child, his part or share will devolve on his children during the lives of such children, and the survivors of them.

3. If any child in the second degree should die in the lifetime of any child of the testator, leaving a descendant, such descendant will succeed to a life estate in the part or share of his immediate ancestor.

4. The succession of life estates will continue until the death of the last of the descendants who shall come into being before the death of the last survivor of the testator's children.

5. The distribution is to be continued until the expiration of the lease granted for ten years, and running at the expiration of the preceding lives, amongst the persons who may at the time of distribution be inheritable as heirs-at-law of the testator's children.

6. And ultimately the principal estate, so far as it consists of personalty, is to vest in and be distributed amongst the last mentioned class of persons.

7. It is unnecessary to consider whether there is an implied limitation over of the fee in the realty. It is very clear that the testator did not contemplate an enjoyment of the fee, or the exercise of a dispositive power over the same, until after the determination of the estate expressly limited to the trustees.

The opposite of this construction would give the estates, real and personal, to the testator's children absolutely; and if the opinion of the Court below is to be sustained as incident to the absolute ownership, the right to call for a conveyance of the legal title, and thus to extinguish all

powers of leasing and superintendence which are given to the trustees by the will.

Of those two theories, that which is presented by the appellants alone is consistent.

1. With the purpose of the testator as expressed in the opening of the first article of his will: "Desiring that my City Hotel in Baltimore should be permanently conducted after my death, and believing that the property thus employed will prove a sure and better resource for my family." * * *

2. With the general texture of all the provisions to be found in the first article ; which would indeed be super-fluous and unavailing, if the testator intended that his children should succeed to the entirety of his interest in the property, with the dispositive power which is inseparable from absolute ownership.

3. The theory of the appellants is further sustained by the letter of the direction to distribute the rents as received, "to and amongst my children and their heirs *per stirpes.*" "Heirs," in reference to devises of real estate, is usually a word of limitation. Under special circumstances it may operate as a word of purchase. In dispositions of personal estate, if it has any operation whatever, it must take effect as a designation of the person, who at the time fulfils the character of heir-at-law of the parties named. Excepting in remote collateral successions, heirs—*qua* heirs—always take *per stirpes.* And it is only in a case where heirs are to take as purchasers, and indifferently therefore, *per stirpes* or *per capita*, that one or other expression is appropriate in order to avoid obscurity. When, therefore, the fund consists of fee-simple estates, leaseholds and personal chat-tels, and is given to trustees, not absolutely, but for a term which may subsist for several generations, and is to be managed as one undivided fund, for the benefit of persons who are indifferently treated as "the family" of the testa-

tor, and as his "children and their heirs *per stirpes*," we must understand by the latter expression the children of the testator, and their children, or other descendants succeeding in their own right, to such share or proportion of interest as had been enjoyed by their immediate ancestors. *Porter vs. Fox*, 6 *Simon*, 492. *Snowden vs. Fitzhugh*, 19 *Md. Rep.*, 197.

4. It is also sustained by the alternative disposition made by the second article of the will. There could be no disappointment of the views of the testator if he intended to give to his children the fund absolutely, and with the power of enjoyment or appropriation thereof in such form as they might deem expedient. Such disappointment was anticipated as the conclusion from the possible adjudication, that the will, if operative at all, would bind the property for a longer term than was allowed by the policy of the law. In this event he makes a disposition which is clearly unexceptionable. He gives the fund beneficially to his children during their lives, and absolutely to their immediate descendants. This limitation of the interests of the children, to a life estate in the proceeds of the property, after it has been converted into money, is hardly reconcilable with the theory, that the primary intent of the testator was to give to those children, the absolute interest in the property, with the power of converting the same at their pleasure. As to intention in wills, see 1 *Jarman on Wills*, 411. *Iglehart vs. Kirwan*, 10 *Md. Rep.*, 564. *Lingan vs. Carroll*, 3 *H. & McH.*, 333. *Berry vs. Berry*, 1 *H. & J.*, 421. *Walston vs. White*, 5 *Md. Rep.*, 303. *Simpers vs. Simpers*, 15 *Md. Rep.*, 187. *Workman vs. Cannon*, 5 *Harrington*, 91. *Thrasher vs. Ingram*, 32 *Ala.*, 645.

*I. Nevett Steele* for the appellees.

1. The intention of the testator, expressed in the first

article of his will, is free from any ambiguity.   He thereby devised and bequeathed to the trustees the hotel property and furniture, in order that they might make successive leases, from time to time, for the period of time therein mentioned, of such part of the property as constituted the hotel proper and the furniture belonging thereto, and that they might and should dispose of the rents in the manner therein mentioned.   Whether such intention is, or is not, consistent with the rules of law, is a different question, and cannot control the construction of the will in the effort to ascertain the actual intention of the testator. *Scarborough vs. Doe & Saville*, 3 *A. & E.*, 897, (30 *Eng. C. L. Rep.*, 266.)   *Lewis on Perpetuities*, 52 *Law Lib.*, 144.

2. The devise to the trustees and their heirs, unrestrained by other parts of the will, would be construed to be in fee-simple ; but as the devise is coupled with a trust and a power of limited duration, the fee is determinable with the termination of the power and trust ; that is, when the power to lease shall have ended, and when the current lease, existing at that time, shall have ended, and the trustees shall have received and have paid over the rents. *Playor vs. Nichols*, 1 *B. & C.*, 336, ( 8 *Eng. C. L. Rep.*, 144.)   *Doe vs. Timmins*, 1 *Barn. & Adol.*, 538, 545.   *Doe vs. Simpson*, 5 *East.*, 562.

3. It follows, as a consequence, that the estate of the trustees was a particular estate ; that is, an estate to endure as long as, and no longer than, the trust was to continue ; and hence it results, as a further consequence, that the remainder was not affected at all by the first article. That remainder passed, under the residuary clause, (7th article of the will,) in fee as to the realty, and absolutely as to the personalty to his children.   Even, therefore, if the first article, upon any ground, should fail to operate in whole or in part, such failure would only affect the par-

ticular estate, and not the remainder. *Doe d. Stewart vs. Sheffield*, 13 *East.*, 527. *Williams d. Goodtitle vs. David*, 10 *B. & C.*, 895. *White vs. Vitty*, 2 *Russell*, 484—4 *Russell*, 584. *Goodtitle d. Hart vs. Knott, Cowper*, 43. *Morris vs. Underdom, Willes*, 293. *Ferguson vs. Hedges*, 1 *Harrington*, 524. *Hayden vs. Stoughton*, 5 *Pick.*, 537, 538. *Bringham vs. Shattuck*, 10 *Pick.*, 306. *Lingan vs. Carroll*, 3 *H. & McH.*, 323.

4. But the first article does not violate the rule against perpetuities. That rule does not apply to the quantity or quality of estate in the property devised in trust, but to the ownership of the estate devised in trust ; that is, to the estate of the *cestui que trust*. Property may be validly devised to trustees in fee-simple, in fee tail, especial or general, or for a term of years renewable forever, for the benefit of the *cestuis que trust*, but it is not permitted that the ownership of the *cestuis que trust* shall be "tied up" for a period beyond the allowable limit of inalienable ownership ; that is, beyond a life or lives in being, and twenty-one years and a fraction of a year. 8 *Bligh.*, 299. *Lewis on Perpetuities*, 541, (52 *Law Lib.*, 338.)

5. Nor does the rule apply to powers over property where powers are separable and separated from the beneficial ownership of the estate, and are not in restraint of alienation of the estate, legal or equitable, of the beneficial owner, for any period beyond the allowed limits. And this doctrine is alike applicable, where powers are conferred, to be exercisable over an antecedently created estate, or where the estate is, or may be, intended to be created through the exercise of the powers conferred.

6. The real question, therefore, in any and every case which comes under judicial consideration in relation to the applicability of the rule against perpetuities, must be the single and practical enquiry, whether the beneficial ownership of the estate is "tied up" and made inalienable for a

period of time beyond the time allowed by the established rule against perpetuities.

7. There is nothing, therefore, in this first article which transgresses the rule. Upon just construction, the powers of the trustees were not intended to endure beyond the lives of persons who should, at the moment of the death of the testator, answer the description of children or descendants of children. It was not intended that after-born descendants of children—*post nati*—should be embraced within the continuance of the powers to lease. The word "left" is not of the same import as if the language had been "may be left by them at the period of their deaths respectively."

If, however, it should be held, that the powers are to be exercised during the lives of after-born descendants of children, then the practical question suggested in the sixth point will arise, and that is, whether the property is "tied up," from generation to generation, so as to be incapable of alienation within the period allowed by the rule against perpetuities. And upon this question the point is confidently made, that *uno flatu* with the vesting of title in the trustees, the right of alienation vested in the *cestuis que trusts* of their equitable estates in the rents. The language is plain and unambiguous,—"in equal shares to and among my children, and their respective heirs, *per stirpes*," &c.

What language could be employed more apt to create a vested estate, *in præsenti*, as to the rents to accrue under the trust? There is no limitation over. The words "*per stirpes*" are here mere words of representation, not of purchase. The child was the *stirps* through whom the heirs of such child were to take their shares of the accruing rents. They are the very words to indicate an estate in fee. And if, by judicial construction, the case should be brought within the rule in *Shelley's Case*, the result would be the same. *Supplement to Lewis on Per.*, (66 *Law Lib.*,) 154,

155.   *Doe d. Long vs. Prigg*, 8 *B. & C.*, 229, (15 *E. C. L. Rep.*,) 121.   *Dorsey vs. Dorsey*, 9 *Md. Rep.*, 31.   *Ware vs. Richardson*, 3 *Md. Rep.*, 544.   *Simpers vs. Simpers*, 15 *Md. Rep.*, 107.   *Smith vs. Clark*, 10 *Md. Rep.* 194.   *Cassilly vs. Myer*, 4 *Md. Rep.*, 1.

8. If the last point be well taken, then the right of alienation would be an incident or quality of the estate, and the deed of Augustus Barnum, and the deed of Caroline Barnum, devisee of Ephraim Kirby Barnum, effectually conveyed to Mr. McLaughlin the titles of both, not merely in the residue of the estate, but in the rents. Hence, the appellants would have no titles to maintain this suit.

9. If however, upon any theory of judicial construction, it shall be held that the first article violates the rule against perpetuities, the effect would be, not to avoid the trust, nor to destroy the power *in toto.* The power would be good *pro tanto,*—would endure as long as it might endure without trenching on the rule, and would be void only for the excess. *Biddle vs. Perkins*, 4 *Simons,* 135, (6 *Cond. Ch. R.*) *Powis vs. Capron, Id.*, 139. *Collins vs. Freestone*, 10 *Simons*, 225. *Nelson vs. Callow*, 15 *Simons*, 353, (38 *Cond. Ch. R.*,) *Wood vs. White*, 4 *Myl. & Cr.*, 460, (18 *Cond. Ch. R.*,) 480. *Boyce vs. Hanning*, 2 *Cromp. & Jer.*, 334–344. *Ferrand vs. Wilson*, 4 *Hare*, 377–381. *Lewis on Perpetuities*, 494–5, (52 *Law Lib.*, 328, 304, 305, 364.) *Sugden on Powers*, 2d Vol., 469–472.

10. If, however, the first article be void in whole or in part, still, as to any property covered by the trust which would have passed under the residuary clause, and also any parts of said property which passed to the children of the testator by descent, as not effectually disposed of by the will, and also any property to which they were entitled in a course of distribution, the appellants can make no claim, because the deed of their father and of the devisee of their uncle, in terms, covered all the property, as well personal

as real. The appellants can have no right, therefore, unless the second article took effect, in operation, upon the decease of the testator, in displacement of the first article. Their claim is necessarily based on the second article, and their proposition affirms that their father and uncle had but estates for their respective lives.

11. But this second article was never intended to go into operation unless a sale of the ground-rents and buildings should judicially or otherwise, against his will, take place. It was to take effect, if at all, after a sale, and in consequence of a sale, in disappointment of his views. It was not intended to be a ground and cause of sale. Whether intended *in terrorem*, or as a substitutional provision, it is manifest that a sale, "judicial or otherwise," was made a condition precedent to the effect in operation of the second article. In contemplation of the possible disappointment of his wishes, he may have introduced this provision, as a clause *in terrorem*, to prevent the voluntary destruction of the trust.

12. Upon the double hypothesis that the term (designated in preceding points as a particular estate,) did not pass at all, or only passed in part, under the first article of the will; and that the same did not fall into the residue of the testator's estate, and so pass under the residuary clause, then said particular estate, or so much thereof as did not effectually pass under said first article, must be considered as property of the testator whereof he died intestate, and passed as provided by law in cases of intestacy. *Torrance vs. Torrance*, 4 *Md. Rep.*, 11.

*Wm. Schley* also for the appellees.

The appellants, in this case, base their claim on two propositions; and their claim is without support, unless both propositions can be established.

*Firstly.* That the first article of the will transgresses the

established rule against perpetuities, and for that reason is void ; void *ab initio* and *in toto*.

*Second.* That this article being void as alleged, the second article took effect, in operation, presently upon the decease of the testator ; and that, under said second article, their father, Augustus Barnum, and their uncle, Ephraim Kirby Barnum, took, respectively, estates for their natural lives, and no longer.

I shall consider, first in order, the objection to the first article of the will.

In the interpretation and construction of a will, the first object should be to ascertain the actual intention of a testator ; and such intention is to be gathered from a careful and true consideration of the whole will, by just and reasonable exposition, regardless of the ulterior question whether such intention can or cannot be carried into effect consistently with the rules of law.

Now, apart from the assumption that the first article violates the rule against perpetuities, there can be no reasonable doubt as to the actual intention of the testator. He desired the hotel to be rented out in the manner expressed in said article, during the period specified in said first article. He had two objects in view, plainly expressed in said first article. One was that the City Hotel should be permanently conducted, after his death, in a becoming manner as a hotel ; and the other, to provide, what he considered, a sure resource for his family from the rents to accrue from leases of the hotel property. As a mode of carrying these views into effect, he devised the property to trustees, &c., with power to rent, for successive terms, during "the period" mentioned in said first article, with special directions, that, in all leases, the tenants should be required to keep and deliver up, in as good condition as delivered to them, the furniture, &c.; and he also directed how the accruing rents should be applied and distributed.

The precise question to be decided, on the point of the actual intention of the testator, respects the duration of the period within which the trustees were empowered and directed to make leases.

The appellants insist, that the trustees intended to embrace, within said period, the lives of descendants of any of his children left by any child, at the death of such child, whether such descendants were living at the death of such testator, or should be born after his death ; and that, therefore, the period of time, during which the trust was to continue, and the power to lease was to be exercised, transcended the utmost limit of time allowed by the rule against perpetuities. The appellees, on the other hand, insist, that upon the true exposition of his intention, gathered from the whole will, the prescribed duration of said period does not offend against said rule.

I do not propose to consider now what the effect would be if the actual intention shall be such as the appellants insist. But regardless entirely of the effect of his intention either way, I desire to establish, that the position of the appellees as to his intention, in fact, is correct.

It is unnecessary to cite authorities for these positions ; that in the exposition of a will, the intention of the testator is his will ; in the language of Lord Chief Justice WILLES, the rule is *"voluntas testatoris totum est ;"* that his intention is to be collected from the words of the will free of conjecture ; that such intention is to be gathered from the whole will, and that the intention, at the time the will was made, is the intention to be discovered, if possible ; and that such intention, when discovered, so far as may be consistent with the rules of law, shall prevail and be carried into effect. It is a common saying that a will must be made to speak from the testator's death, and this is true, for it then goes into operation and first speaks out. In the language of a very respectable writer, *Ram. on Wills,*

108, (*Law Library*, 8th *Vol., page* 59.) "What does it speak? Does it say more than what the testator said when he made his will? Were it permitted to say more, ( at the testator's death than he intended to say when he made his will,) "clearly the law would fulfil an intention which is not expressed in the will." The true statement is that the will was ambulatory during the lifetime of the testator, and only became a finality at his death, but it then becomes a finality of the intention existing at the making of the will, and therein expressed. There is nothing, however, in the rule which prevents a testator from providing by anticipation for future events, certain or contingent. Contingent remainders, springing uses, shifting uses and all executory limitations are valid, subject only to the overruling power of the law. No individual can make a law in his own case, in disregard of the law of the land, The rule in Shelly's case, for example, professedly disappoints the actual intention of the testator, but before the rule applies, it is necessary to ascertain the actual intention, in order to ascertain whether the case is one for the application of the rule. In case of an estate tail, the entail may be docked by a common recovery in England, and here it may be docked by a deed of bargain and sale, yet, in such case, it is always necessary, by ascertaining the testator's intention, to discover whether the estate created is or is not an estate tail. So the rule against perpetuities overrules any testamentary disposition which contravenes said rule, but it is necessary to ascertain the actual intention of the testator, in the particular testamentary disposition, in order to ascertain whether his intention, if carried into effect, would or would not constitute a perpetuity.

1. I proceed, therefore, to ascertain, if I can, the intention of the testator as expressed in the first article of his will.

In disposing of the rents, he directed, that after deduct-

ing one-third allotted during her life to his wife, the remaining two-thirds should be divided in equal shares among his five children, (named in said article,) and their respective heirs, *per stirpes*, and that the one-third allotted for her life to his wife, should, after her death, be divided in like manner. The word "heirs," as here used, cannot by any possible construction, be deemed a word of purchase, and each child took a present, vested, absolute estate in his allotted share of the rents. Technical words, when used in a will, are presumed to be intended to take effect in a technical sense, unless a contrary intention shall appear in the will. *Scarborough vs. Doe & Saville*, 3 *A. & E.*, 897, (30 *Eng. C. L. Rep.*, 266.)

In the introductory part of the first article, he uses the indefinite words "my family," and we see by the actual disposition of the rents, that he meant thereby to designate his wife and children. The heirs of children were not to take any part of the rents in their own right, even if any child should die in the lifetime of the testator, otherwise than by representation of such deceased child, in right of such deceased child claiming under and through their parent as the *stirps*. Clearly, in the gift of the respective shares to his children, he did not intend to give them such shares for any period of time less than the whole period of the duration of the trust. Now I deem this important, as tending to elucidate the meaning of the testator, when he undertakes to define the period during which leases were directed to be made. I quote the language: "And the period during which my trustees, and their heirs and successors, shall have the power and are required to lease as aforesaid, shall be so long as my said children, or any children or descendants of them, or of any of them, left by them, or any of them, at the death of them, or of any of them, shall live, it being understood that any lease made during the period aforesaid, shall have full effect and continue for

its stipulated term., notwithstanding the cessation of all of said lives before the end of said term." Now, as one object for devising the property in trust was to provide a sure resource for his family, and as he has indicated in a prior part of this article, the persons intended to be embraced in the word "family," and as he gave to his children absolute shares of all rents to accrue from the leases, for the whole period during which leases were to be made, it is, at least, reasonable to suppose that he would, so far as the object of the trust was concerned, limit the period of leasing to the lives of his children, and as he contemplated the possibility of the death of one or more of his children, leaving children living at his death, he naturally added those lives to the others in defining the period, or for the gratification of another object of the trust, namely, the continuance of the property as a hotel; he may have desired to embrace in the number of lives all descendants *in esse* at his death, so as possibly to prolong such continuance by such enlargement. And this interpretation is strengthened by the use of the words "left" and "shall." Both are in the indicative mood. If the testator had used words belonging to the potential mood, it would undoubtedly have favored the argument in support of an intention to include after-born children and descendants. But as this will speaks of the day of his death, it would appear to indicate an intention, by the use of the word "left," to point to his own children, and children and descendants of children, living at the time of his own decease. The word "left" refers to an existing, accomplished event, not to something potential, for who can know that some one of his own children will not survive all his children's children and descendants? If his intention had been so large and comprehensive as the appellants claim, we should probably have found apt words to manifest such intention, as "born

or to be born," or some phrase or word more appropriate than the word "left."

And the word "shall," as here used, has, to my mind, a positive, indicative and demonstrative signification. Now I do not propose to contend, that grammar is to control a Court of Justice in the exposition of a will. But the language of Sir RICHARD PEPPER ARDEN, in 4 *Vesey*, 329, is very apposite here: "Every word is to have its effect. Every word is to be taken according to the natural and common import." As the Court, in construing wills, are frequently required *"ex fumo dare lucem,"* every thing which is found in the will, and which may illustrate the intention of the testator, is deemed worthy of consideration. And it is certainly more appropriate to construe a will by the rules of grammar, where words used in a grammatical sense have operation and effect, than to introduce false grammar to change their meaning.

But reliance is placed, in the brief of the appellants, on the words "permanently conducted," and undoubtedly, if the object to be accomplished by the trust, as expressed on the face of the will, required the creation of a perpetuity, then the argument in support of an intention to create a perpetuity would be eminently proper. But the word "permanently" does not mean "forever." It imports continuance, but no definite time. A permanent boarder at this hotel is such if he be not a casual or transient guest. A servant "permanently" employed there is one who, like Susan Nipper, is not merely "a temporary;" not one employed for the occasion upon some emergency. But here the word "permanently," a word of indefinite meaning, is so far limited in duration, that it is not to extend beyond the "period" fixed by the testator in the latter portion of this clause. We can only define the length of time intended to be covered by the word "permanently," by first ascertaining the duration of the period fixed by the testa-

tor. It is not an uncommon effort to explain a passage by another still more obscure,—"*ignotum per ignotius.*"

But it is seriously insisted, in the brief of the appellants, that the first takers of the respective shares of rent under the first article, were intended to take only estates for life, and that their children, under the term "heirs," were intended to take by succession for their lives, and so on, from generation to generation, until the death of the longest liver of the descendants of the last survivor of the testator's children.

To such suggestions I give the short but sufficient answer, that where a testator uses certain words which, in a legal understanding, have a known and definite meaning, he must be taken to have intended to mean precisely what the words employed by him import. We are not at liberty to conjecture as to his meaning. If in giving to his children their respective shares of the rents, he has used words which, in legal signification, import absolute gifts, then in the absence of anything to show that he used words in a different sense, it must be taken that he intended to make absolute gifts. In the language of Chief Justice TINDAL, (30 *Eng. C. L. Rep.*, 266,) "We hold it to be a necessary rule in the investigation of the intention of a testator, not only that we ought to look to the words in the will alone to determine the operation and effect of the devise, but that we ought to disregard altogether the legal consequences from the nature and qualities of the estate, when such estate is once collected from the words of the will itself. In determining, therefore, what the intention of the testator was in any particular case, &c., &c., we have no right to assume that the testator was himself ignorant of such legal consequence and effect, or that he had not taken it into consideration. The only safe course is to look carefully for the intention of the testator as it is to be derived from the words employed by him within the whole will, regardless alike of any general

surmise or conjecture from without the will, or of any legal consequences annexed to the estate itself, when such estate is discovered within the will."

It might as well be suggested in a case where, from the words of the will, there is a clear devise in fee that the testator really intended that his devisee should take but an estate for life, and that his heirs should have a remainder as purchasers.

If these views be correct, then the duration of the trust estate did not exceed the limit allowed by the rule against perpetuities; and as the power to rent is engrafted on the trust, and merely ancillary thereto, the duration of the power was limited in like manner.

2. But even if the actual intention of the testator embraced, as part of the period of the trust, the lives of after-born descendants, the trust would not for that reason be void in any degree, either wholly or in part.

It will be noticed that the leases are to be made from time to time, in no case for a term exceeding ten years. The leases, therefore, would not create estates that would transcend the rule.

It will also be noticed, that there is no restraint against alienation by his children of their respective shares, even for a day. There is no remainder, vested or contingent, in the shares of rents given to any other persons, no shifting or springing uses, or other executory limitations. The children took vested estates in their respective shares, presently on the death of the testator. Hence, the right of alienation, as a legal incident, attached at once to the respective shares of Augustus Barnum and Ephraim Kirby Barnum.

Keeping these considerations in view, what possible difference can it make, so far as concerns the rule against perpetuities, whether the trust and power were to continue and be exercised for one generation, or two, or indefinitely?

The rule against perpetuities is levelled, not against vested estates capable of immediate alienation, but against future estates, which, by possibility, may not certainly vest within the limit prescribed by law, and against provisions rendering vested estates inalienable for an excessive period. Avoiding these objections which the law sternly denounces, property may be devised in trust for a term of years, long or short, "whilst water shall flow or grass shall grow," in tail or in fee. Take, for illustration, the case of an estate tail. Such an estate may endure for generations, and yet was never considered as subject to this rule, and for the plain reason that it is destructible by a recovery, and with us, by an ordinary deed of bargain and sale. Still, using the case of an estate tail for further illustration : An estate tail differs from an estate in fee-simple in having a remainder that may be validly devised, if properly devised. Suppose it is devised at the moment of the creation of the estate tail, so as to become a vested remainder, although the period of enjoyment is indefinitely postponed. The devise of such an estate is not within the rule against perpetuities, because presently vested, but if devised upon a contingency, so that the estate, by possibility, may not become vested until beyond the permitted period, it is too remote. The distinction which will appear by a contrast of an estate tail, where there is a remainder, and the case of a limitation of a fee upon a fee, where there is no remainder, and which can only take effect, if at all, as an executory devise, will afford another apt illustration. In the latter, the estate under executory devise, must necessarily be contingent, and the period when it will vest at all, must be necessarily indefinite, and hence the numerous cases in the reports of executory limitations, after an indefinite failure of issue, and which species of limitation the rule annihilates.

Other cases might well be put for illustration, but suf-

ficient has been said to show the character of the proposi-
tion which I have asserted.

The whole doctrine on this subject is very lucidly stated
by the author in *Lewis on Perpetuities*, ( 66 *Law Library*,
28, 31. He does not seem to attach as much importance to
the attribute of alienability as some judges have done, but
he considers remoteness to depend on the distinction between
vested and contingent interests, regardless of the period of
possessory enjoyment.

3. But if the trust and power, or either, be liable to
exception under the application of the rule, then the fur-
ther inquiry would arise, whether both, or either, are or is
void *in toto*, or only *pro tanto*.

It will readily be acknowledged that there is a distinc-
tion between a case of a future estate to arise under the
execution of a power, and an estate existing independently
of the power, and when such power is merely annexed to
the estate for administrative purposes.

In the former case the estate may be void, inasmuch as
it would necessarily depend on the validity of the power
for its support; and if the power be void the estate would
necessarily be so, and therefore, in such case, the apt
inquiry would be as to the validity of the power. In the
latter case the estate may be good, even if the annexed
power is void, provided the power be not an essential, com-
ponent part of the estate. The estate and the power, if
separable, would in such case be severed. If the trust
itself be lawful, it would not fail, although the means be
objectionable. Equity would in such case provide the
proper means to carry the trust into effect.

There is another distinction in relation to the execution
of powers, and which is especially material in the consider-
ation of this point. Here the trustees are to make leases
for successive terms, &c. Each lease is a separate and dis-
tinct act. The testator himself created a term of three

years, and the trustees were directed, after the expiration of that term, or in case the designated lessees should not accept, to lease for successive terms, not in any case for a term exceeding ten years. Now, as the first lease was to be made by the trustees, at farthest, at the end of three years, and was to continue only for ten years, there could be no objection, of course, to their power, or to the lease, unless it can be found in the accompanying provision, that they shall "from time to time, during the period herein-after mentioned, lease," &c. But as each several lease is a distinct and separate act, the power to lease "from time to time" must be deemed a power to do several successive acts ; and it does not follow, even if it be true that some of the leases directed to be made would be void as being created beyond the period allowed for the exercise of the power, that those leases, made within the allowed limits, would also be void. Such a power may well be apportion-ed. A power to make leases not exceeding ten years, from time to time, during the lives of persons in being at the testator's death, and also to make leases during the lives of after-born persons, may be void as to the latter portion of the period, and yet good as to the former period. The power may be validly exercised during the lives of the persons in being, and yet be void as to the residue of the period. The decision of Vice Chancellor WIGRAM, in the case of *Ferran vs. Wilson,* 4 *Hare,* 377, (30 *English Chancery Reports,* 376,) approves of the apportionment of the power in such a case. This decision is commented on in the supplement to *Lewis on Perpetuities,* 196, (66 *Law Libary,* 134.)

4. I pass now to the ulterior question, as to the effect of the invalidity of the power *ab initio,* or as to the effect of its *cesser* at any time during the prescribed period.

The trust having been manifestly created for the pur-poses of enabling the trustees to make leases, and to dis-

tribute the rents as directed in the will, the trust, in its origin, was limited to the accomplishment of the object of its creation. Even, therefore, if it was the intention of the testator that the trust should continue as long as any descendant of his children, living at the death of any of his children, should live, still this would only be the creation of a limited estate of indefinite duration, and the residue of the interest of the testator would remain subject to his disposition. That residue of interest passed under the seventh article of his will. The language is very comprehensive—"all the rest and residue of my estate, of every kind, not hereinafter disposed of, I give and devise, &c., &c., to and among all my children and their heirs, as tenants in common, share and share alike," &c., &c.

Whether, if the trust was *void, ab initio,* the limited estate intended to have been placed in trust, or if void *pro tanto,* the residue of said limited estate would sink into the residue, and so pass under the seventh article of the will, or whether it would be disposed of by law as property whereof the testator died intestate is, in this case, a question of no practical importance. For Augustus Barnum, the ancestor of the complainants, and under whom they must necessarily claim, ( unless the first article is displaced by the second article of the will, and as to which I shall presently speak,) by his deed, before referred to, conveyed "all the estate, real, personal and mixed, in possession, remainder, reversion, or expectancy, legal or equitable, to which, by devise, or bequest, or descent," he was entitled in his father's estate. And although the deed from Caroline Barnum is not so full, yet it could readily be shown, if it were necessary, that her deed, in connection with the deed of Ephraim Kirby Barnum, conveyed all his interest in his father's estate to Mr. McLaughlin. But it is unnecessary to discuss questions of estoppel or election, inasmuch as the devise, by Ephraim

Kirby Barnum, of all his estate, real and personal, to his wife, Caroline Barnum, effectually prevented the accrual of any right in his estate on the part of the appellants; and the bill, indeed, expressly states that Ephraim Kirby Barnum devised all his real and personal estate to said Caroline Barnum, and concedes that if he had any estate beyond his life, the same had become vested in Mr. McLaughlin.

5. More has been said than perhaps was strictly necessary on so much of the case as has been considered, for the appellants, in effect, claim, and claim exclusively, under the second article of the will. It seemed to me proper, however, to consider every question which I have discussed as introductory to an examination of this second article. For if the first and second and third points made in this argument, or any one of those points, be well taken, then it is clear that there has been no disappointment of the views of the testator as expressed in the first article, even in the sense in which the appellants construe the word "disappointed" as used in this second article. And if it should be held that my notions, as embodied in the discussion of these points, are wrong, still the fourth point is important, inasmuch as it clearly shows that the appellants cannot possibly have any right unless they can make good their claim under the second article.

It cannot be disputed that the effect, in operation of this second article, is strictly contingent, dependent on the actual occurrence of a certain event, and which is carefully specified in said article itself. That event is the contingency that the views, embodied in the first article, shall be disappointed, so that judicially or otherwise, a sale shall take place of the City Hotel, buildings and grounds during the life of any of his children.

A sale is a condition precedent, a sale in fact, not of the respective interests of all, or of any of the *cestui que trusts;*

ʼout of the said City Hotel buildings and grounds. The ·distinction between a sale of the property itself and the ·sale of interests by the *cestui que trusts*, is broad and mate-·rial. For in the sale of the property, his scheme for the ·continuance of the hotel for a certain period, (one object of the trust,) would be clearly disappointed; whereas, sales of their respective interests, by all or any of the *cestui que trusts*, would not interfere with the trust, nor necessarily divert the property from use as a hotel, and would not be, in any other respect, in disappointment of his views as ·expressed in said first article, because, in giving interests to his children, in manner as thereby given, he meant that ·they should take such quantity of interest as he thereby gave; and the right of alienation is a legal incident, annexed by law to such interests as he gave, independently ·of any wish or desire which may be supposed to have existed on the part of the testator. If it be suggested that he wished, in the first article, to limit the estates of his ·children to mere estates for life, the answer is, if this be· so, *quod voluit non dixit*. In using technical words, the· ·testator must be supposed to use them in their technical sence. If it had been an estate in fee, with which he was dealing, instead of the division of rents to accrue during a ·limited period, he could not have used any more appropri-·ate words to give an absolute estate.

And to show more clearly that this second article was only to take effect in case of a sale of the property itself, ·and after such sale, and in consequence of such sale, we ·find that the proceeds of sale are the subject of disposition in ·this second article. It is in nature of a springing use, ·not precisely a shifting use—the accrual of new and sub-·stituted rights, dependent on the occurrence of a state of ·case which has not as yet happened. It is strictly analo-·gous to a contingent executory limitation to arise upon a· ·future event, which may or may not occur.

Two of the children, Mrs. Stannard and Richard Bar-num, are still living, and within the life of the longest liver of them, such state of case, if it be possible, may happen. It has not yet occurred. I rest this part of the case on the short but sufficient exception, that the appellants have not any title, under the will, to maintain this suit. If they have any right at all, it is merely executory and contingent, dependent on the occurrence of an event which has not as yet happened, and may never happen.

There are cases, indeed, in which equity has interferred, at the instance of persons having contingent interests, to prevent waste or other destruction of property, on bills in nature of bills *quia timet.* But the effort in this case, is an effort in fact, to convert a mere contingent interest into a vested right, by procuring a judicial sale of the property, in direct violation of the testator's views, as expressed in the first article, so as to bring the second article into operation. Claiming under the will, they must claim according to the will. They cannot invoke the aid of a Court of Justice for the purpose of disappointing the will of the testator in its primary object, by destroying the vested rights of persons entitled under the same instrument, so as thereby to create in themselves a vested and inconsistent right.

I deem it unnecessary to notice minor points suggested in the preceding argument of the appellees on this part of the case, as the one exception is quite sufficient.

The views put forth in this argument are the result of an extented examination, and careful consideration of elementary writers and decided cases ; and they are respectfully submitted to the Court.

*Thos. S. Alexander* for the appellants in reply.

It is conceded that the appellants must show that, as children of Dr. Augustus Barnum, deceased, they are entitled to an account of rents and profits of the City Hotel

property, accrued and realized since the death of their father, and to a participation in the accruing rents, or to a sale of the premises, on showing that such sale will promote the advantage of all parties having interests in the property. They must claim, if at all, directly under the last will of David Barnum, deceased.

It is conceded likewise, that in order of discussion, the first question involves the interpretation of the will, or in other words, the actual intent of the testator. We agree too that the canons of interpretation are stated with sufficient accuracy and fullness for the purposes of this case in the early pages of the arguments made on behalf of the appellees, and we must show that the intent of the testator as thus collected, was to secure to the appellants, from the time of the decease of their father a right to share in the distribution of the rents, to be realized thereafter.

Now this intent is demonstrated by the first three lines of the first article of the will. The great object of the testator was to provide "a sure and better resource for his family," and he proposed to accomplish that object by the direction that his City Hotel should "be permanently conducted" after his death. No motive is assigned, nor can any motive be collected from the will for the direction for permanently conducting the City Hotel other than the desire of the testator to advance the interests of his family. *Blackwell vs. Bull,* 1 *Keen,* 177.

But who were to constitute the "family" for whom provision was thus to be made? The arguments for the appellees assert "the wife and children of the testator." Why is it then that the trustees are required to conduct the City Hotel for a term exceeding the lives of the wife and children? In the progress of the arguments it was affirmed, on the authority of *Tolson vs. Tolson,* that the expression "family" was inoperative because of its uncertainty. We are not interested in repelling this argu-

ment. For if the object is void for uncertainty the trust must fail, and the "views" of the testator will thereby be effectually "disappointed." But in truth "family" is rather of an indefinite than an uncertain significance, and its specific meaning in each particular case is dependent on the context in which it is found.

"Permanently" is a word of similar character. It imports fixedness or stability for a term of longer or shorter duration. When those terms are found associated together they exercise a reflex influence over each other; thus, if we can clearly ascertain the term during which the City Hotel is to be "permanently conducted," we must conclude that the testator under the description of "family" embraces the persons and classes of persons in succession towards whom he might be supposed to stand in *loco parentis* during that entire term of time, and so if the family could be certainly defined, then we might conclude that the City Hotel was to be "permanently conducted" so long as those persons existed for whom provision was intended to be made under the description of "family."

Now we shall find by referring to the last sentence of the first clause, that "the period during which the trustees shall have power, and are required to lease as aforesaid, shall be so long as my said children, or any children or descendants of them, or any of them, left by them, or any of them at the death of them, or any of them shall live," and until the termination by efflux of time, of any lease made during the period aforesaid, and which may be in force at the cessation of all of said lives. The conclusion then is, that the testator intended to provide for a family which was to endure, during the life of the survivor of his children, and during the life of the last of his descendants, born during the lifetime of his surviving child, and for a term of ten years thereafter. If we adopt the interpretation which the appellees would give to this clause, the

term during which the leasing trust, or power is to be exercised would be restricted, but the conclusion would remain that during this restricted term there would be a family to be provided for out of the profits of the City Hotel.

Let us next inquire whether there is anything in the will in conflict with the definition which is thus given to the term "family." The City Hotel is to be leased, the rents are to be collected periodically, and as realized are to be distributed to and amongst those who at the respective periods of distribution, may constitute the family for whose sure and better resource the trust was created.

The persons amongst whom the rents are to be distributed are described as "my children and their respective heirs *per stirpes.*" On the part of the appellees it is argued that heirs is a word of limitation when used for the purpose of enlarging the estate of the first taker. But this is a begging of the question. Technical words like other words of art yield to the intent of the testator, when it is clearly expressed. Of the facility with which the term heirs may be converted into a term of purchase, the case of *Ware vs. Richardson,* 3 *Md. Rep.,* 505, is an illustration, and the question here is whether the testator, by giving to his children an absolute interest in and dominion over the subject of the devise, intended to confer on them the power at their pleasure of disappointing the views which he had so elaborately developed, or whether he intended to designate with greater certainty the succession of persons who had already been described as his family, and for whose sure and better resource the entire provision had been contrived? Against the construction suggested by the appellees, it may be objected: First, That at the date of the will, words of limitation were not requisite to enlarge the estate of the first taker of real or personal estate. As a word of limitation, therefore, the term was

unnecessary. Secondly, As applicable to personal estate, the term heirs is devoid of meaning, unless intended to designate the person or persons who were to take in succession in their own right. Thirdly, The intent clearly was that the entire fund compounded of real estate, leasehold and personalty, should be enjoyed by the same persons, and as the term heirs can operate only as *designatio personæ*, who is to succeed to so much of the funds as is constituted of personal estate, it is fair to infer that the testator intended to use the same expression in the same sense in its application to real estate. Fourthly, The complex expression, my children—their respective heirs—*per stirpes*, is naturally suggestive of a succession of persons who are in their turns to become the partakers of the testator's bounty. There are children—next persons, who are in a stricter or looser sence termed "heirs," and again, gradations of heirs, to prevent confusion amongst whom, it is directed that they should take *per stirpes*, or in other words, shall succeed each to the part or share of the part of his immediate parent, and so up to some one child of the testator, as the *stirps*, or source of that branch of the family; and lastly, by adopting our construction, uniformity and consistency is maintained throughout all the provisions of the will, amongst which on any other hypothesis there must exist an irremediable discord.

We conclude then, as we have done in our opening argument, that the testator intended to provide for his children, and their descendants in their successive generations, during the whole term prescribed for the exercise of the leasing trust or power, and that the persons thus constituting the family at the moment that leasing trust or power became exhausted, were intended to take absolutely the principal fund. As matter of actual intention, we affirm that the testator did not intend that any interest or estate in the City Hotel should pass by the devise of the residue

of his estate, and it is equally certain that he did not intend to die intestate as to any part of his property.

2. We proceed next to discuss the legal effect and operation of the will, to show that is, how far it may operate consistently with the law, and in what respect, if any, it conflicts with the policy of the law.

An estate may be given to A. for life, with remainder to his unborn son in fee, in tail or for life. But there cannot be a further limitation of the estate for years, for life, or in fee to the issue of such unborn son, or any other disposition thereof, which is to be contingent with respect to the person of the donee. Every disposition of the fee or of any lesser estate, must be alienable within a life or lives in being, and twenty-one years thereafter, or must depend or be expectant on some antecedent estate which may be aliened, and the alienation whereof will destroy all subsequent limitations.

Trusts and powers are subject to the same law of perpetuity which refers to dispositions of legal estates.

It results, therefore, that the estate is validly vested in the trustees, and if the trust or power be not absolutely void, for the reasons hereafter stated, it may be exercised during the lives of the testator's children, and possibly of their children. Beyond this limit no such trust or power can be exercised or extended. In respect to the limitations after the expiration of the last of those lives, whether for years or in fee, the trusts are certainly void, as tending to perpetuity, and indeed we submit, on the authorities, it is clear that no lease can be validly executed after the expiration of twenty-one years next succeeding the expiration of the last life in being at the death of the testator.

Being thus bad in part, though good in other parts, the entire limitation must fail, unless the case can be taken out of the operation of the general rule upon some one or other of the grounds taken by the appellees.

They insist in the first place, that the beneficial interest in the fee being given to the children, with the absolute power of alienation thereof, the case is thus released from the dangers resulting from perpetuities. It is assumed as the basis of this argument that if the beneficial interest is made alienable, no legal inconvenience results from fettering the legal title. It is overlooked that the rule against perpetuities was a rule of the common law before the invention of trusts, and has been imported into equity by analogy, and thus the result of such importation is that the legal estate and the trust or powers, and the beneficial interest which is to be served by the execution of such trust or power, must all be enjoyed in subservience to the law of perpetuity. This point was sufficiently developed in the course of the opening argument.

It is next said that the trust or power is capable of severance. It is a trust or power to lease for short terms in succession. This power may be exercised within a certain limit, although it may not be exercised after that period. The vice of the argument is, that the object of the trust or power is the permanent subsistance of the family. The general rule in regard to the partibility of the powers is stated briefly, but it is hoped accurately in our opening statement, as are also the reasons for supposing that the trust or power now under discussion is not capable of partial execution.

The subject is therefore dismissed with the following brief remarks.

1. If the power or trust is capable of partial execution during the two successive classes of lives, that is, of children of the testator, and of descendants living at the time of the death of the last survivor of the children, and void only for the excess, then the appellants, upon their theory of interpretation, are interested in the execution of the power

Barnum vs. Barnum.

or trust, and have been so from the time of the death of their father, Dr. Augustus Barnum.

2. They are in like manner interested in the execution of the power or trust upon the hypothesis that it may be executed during the lives of the testator's children and descendants in being at the time of his death, and for twenty-one years thereafter.

3. If the power or trust is incapable of execution in any part, then to the like extent there is a disappointment of the views of the testator, and the *casus* arises which was anticipated by the second article.

We proceed next to settle the interpretation of this second article, and the equities of the parties thereunder.

On the part of the appellees it is insisted that no interest can be derived to the appellants under this article until after a sale shall have been effected of the property. The sale is contemplated as the cause of disappointment in the views of the testator. But this interpretation of the article inverts the order of sequences. The sale is the effect induced by some other pre-existing cause.

"Should my views in the above first article of this will be disappointed, so that—in consequence or by reason thereof—judicially or otherwise, a sale shall take place." * * The sale is therefore contemplated as the effect of some pre-existent cause. And this pre-existent cause may have its effect by means of a judicial sale. But a judicial sale is made in execution of a judgment of a Court of competent jurisdiction, which judgment is a conclusion of the law from the case made by the pleadings, and that case in its turn is nothing more than a combination of the facts existing at or before the commencement of the suit. The cause of disappointment to the views of the testator, is, therefore, supposed to have a possible existence at or before the beginning of the suit which it is supposed may have its consummation in a sale. The views of the testator would neces-

sarily be disappointed by a sale, but a like result would follow from any other circumstance which would divert the income of the City Hotel to any purpose other than the support of "the family" of the testator. And again, this cause of disappointment may be contemplated as operative in fact, or as potential. For as a misapplication by the trustees in violation of their trust could not be treated as a disappointment of the views of the testator, so on the other hand, if the provisions made by the first article were inoperative in law as tending to a perpetuity, there would arise a case of disappointment within the intent of the second article. And a brief explanation will suffice to show that it was provoked directly by an apprehension of disappointment from this very cause.

The testator seems to have been aware that there were limits prescribed by the law to the exercise of the testamentary power. But he was unable to define those boundaries with precision. In vindication of his professional adviser, it may be sufficient to remind the Court that many of the cases now treated as leading cases on the subject, are of date subsequent to the will, and many of earlier date were not at that time within reach of the Maryland Bar. In this state of uncertainty as to the extent of his power, he acted as a practical man would act under the circumstances. He first declared his leading object. He then gave in detail the processes by which he would accomplish that object, and confessing now his fears lest his intentions as thus expressed would be disappointed, he lastly provides an alternative disposition, to take effect in that contingency. In vindication of this theory which supposes that his uncertainty arose out of his inability to fathom the rules of the law against perpetuities, we may observe that in either contingency he limited the interests of his children to life estates in the income, and by the second article he gives to their children the *corpus* of the inheritance

absolutely, which, by the first article, he had parcelled out to several successions of generations of his descendants. It is not possible to imagine a cause of disappointment to his views, which would have provoked the testator to reduce the absolute interests first intended for his children to life interests, nor any motive for enlarging the life interests first given to their children, to absolute interests other than the assumed inability to tie up the inheritance for a more extended period. We conclude, therefore, that in the event of a failure of the dispositions made by the first article because of their tendency to fetter the estate for a longer period than the law allows, the testator intended that the estate should vest in his children for their lives, and in their immediate descendants absolutely.

But it is still insisted, that the gift is of "the proceeds of sale," and, therefore, cannot vest until a sale shall have been effected. Now it is to be recollected that equity treats things as done, which ought to be done. It relieves against accidents, and supplies circumstances, and invents remedies in vindication of clearly defined rights, and upon the hypothesis of the failure of the disposition made by the first article, the parties who would become entitled to the proceeds of sale when effected, must have the right to ask that a sale shall be ordered. It cannot be tolerated that the interests of the grandchildren should be dependent on the option of the children, who, in declining an application for a sale, would actually enlarge their estates for life into absolute estates in the principal fund. But the solution of the difficulty is to be found in the anticipation expressed by the testator that the conversion might be effected by a judicial sale. Now a judicial sale must be the sequel of a proceeding which must state a cause for the exercise of jurisdiction, and to which there must be parties interested in the exercise of jurisdiction. But what facts would have to be stated in the present case? the devise in

the first article, the disappointment of the testator's views because of their inconsistency with the policy of the law, the alternative disposition made by the second article, and the necessity of a sale to effect the intent of the testator expressed in that article, and the decree directing a sale would likewise declare the rights of the parties which by legal retrospect would date from the death of the testator, and to this cause the children, and the children of children would be necessary parties. It may be assumed as clear, that any person who would share in the proceeds of sale when made, are proper parties to the suits brought to effect that sale. And it would seem to be equally clear that every person whose right is to be established or negatived, enlarged or restricted by the decree, ought to be a party, and may be a party plaintiff or defendant to the litigation which is to eventuate in the decree.

Assuming, then, that the decree would declare the rights of the appellants to share in the fruits of the decree, such rights must date back potentially to the death of the testator, the clauses creating a perpetuity being void *ab initio*, and the substituted clauses taking effect immediately in that event. Hence they have an equity to maintain this suit.

Upon the theory of the appellees that the trust or power of leasing is good within the prescribed limits, and void only for the excess, the right of suit of the appellants is divested of all shadow of doubt. They will be entitled to an account of profits accrued since the death of their father, and to a share of future accruing profits; and this right carries with it a right to show that a sale is necessary for the interest of all parties and to call for a declaration of their rights in the event of a sale.

We are reminded by the counsel for the appellees that the sale is to be made during the life of some one of the testators's children. As two of those children are yet liv-

ing, it is unnecessary to enquire how far the deaths of all their children would prejudice our right; but it is evident that the reason for this caution of the testator was simply because as, in the first clause, he intended that his children should take life estates only, and had made such disposition as, that if the trust were good, they could not get any more, so here, in the second clause, he thought it proper to guard against any misconstruction of his intention, or attempt of his children to claim more than life estates in any event, by saying plainly that if any sale should take place during the life of any one of his children, such child should not take a fee-simple, but only a life estate in the proceeds of sale, and the more effectually to accomplish his intention, he directs investments by the trustees of such child's share so that it should be put out of their reach for life, but says that the children or descendants of his children are to take as their absolute property, so that if the sale had taken place after death of all the children of the testator, no investment would have been necessary. And we may be excused for the suggestion that in the event of a reversal and remanding of the cause, this Court ought to declare our right to a sale, so that the appellees may be deprived of all motive for involving us in protracted litigation.

Having thus explained our views in relation to the interpretation, and operation of the will, and our rights thence resulting, we will review the argument of the appellees in favor of an opposite interpretation of the clause defining the leasing trust or power. We have explained in our opening argument the distinction between a trust and power, and shall not enlarge on that topic.    1 *Sugden on Powers*, ch. 3, sec. 1, *page* 154.    2 *Sugden on Powers.    Duke of Marlborough*, 1 *Eden.*   Treated for the purpose of this branch of the argument as a power, the question will be whether it is to be exercised for a succession of lives and a term of

ten years thereafter, or for lives in being at the time of the testator's death, and a like term of ten years thereafter. This last is the view taken by the appellees, and their argument is thus presented. The will takes effect at the time of the death of the testator. It speaks of that time. The term "shall" used in the clause in question is future, and denotes a period subsequent to the death of the testator. The term "left" is past, and relates to a time anterior to the testator's death. The power of leasing is, therefore, to be exercised during the lives of the testator's children, and (if any one or more of them should die in the lifetime of the testator, leaving children or descendants who also should survive him) during the lives of such children or descendants of children. Thus the power is limited to lives in being at the death of the testator, and a term not exceeding ten years thereafter. Upon this construction the clause is not liable to objection as tending to perpetuity.

Now as matter of fact, the testator did not anticipate the death of any of his children during his own lifetime. He devises to them by name.

As matter of law, it is not universally true that a will speaks as of the day of the testator's death. In critical construction it speaks as of the day of its date, and every exception to this rule is founded on special considerations, which only confirm the general rule. All this was sufficiently explained in the course of our preceding argument. We dismiss this topic therefore, with the suggestion that if Ephraim, named in the will, had died in the testator's lifetime without issue, and another son had been born to the testator in his lifetime, but after the making of the will, who was also christened Ephraim, this second son would not have taken the share given to the first named Ephraim, but in reference to this share the testator would have died intestate.

But, again, the interpretation proposed to be given to

"left," is not called for by the strict rule of grammar, nor by the looser rule of familiar usage. A participle is not in itself a notation of time. It is not a self-existent part of speech like a noun, nor self-efficient as a verb, but is rather an auxiliary, like an adjective or adverb. It must depend on something else from which it derives its value or significance. This would be true of "left" as the pre-terite of the intransitive "to leave," in its active form. But "left" in its present connexion is the preterite of "to be left," in the passive form. And as a preterite in the passive form its notation of time would depend altogether on its prefix, expressed or implied.

It is a maxim that false grammar does not vitiate, and certainly could not control, the intent expressed, that the leases shall continue during the lives of all the descendants of the testator, who shall be in being at the time of the death of his last surviving child. Lord COKE, as quoted in 2 *Jarm.*, 101, says, that as *procreatis* may embrace subsequent issue, so *procreandis* may include those who are already born, and cases are cited which apply that doctrine.

Can it fairly be supposed, that if the testator really meant to limit the period of leasing to the duration of the lives of his children and descendants, living at his death, he would have used the peculiar and elaborate phraseology, "as long as my children, or any children or descendants of them, or any of them, left by them, or any of them, at the death of them, or any of them, shall live," instead of the simple words, "as long as any of my children or their descendants, living at my death, shall live?"

If he had meant to refer to the date of his own death, he would at least have omitted the words, "at the death of them, or any of them," as defining "left," because in fact the descendants could not have been left until their parents, the children, respectively had died, and so there would

have been no use whatever in the words in that view of the case; but the real use of the words, and we must believe that the testator had a purpose in using them, is to show that he did not mean at his own death, but expressly at the death of his children.

As the testator has expressly said as long as descendants of his children left at the death of them shall live, upon what just grounds can it be supposed that he meant living at his own death? His death and the death of them, or any of them, are two distinct forms of expressions, with distinct meanings. No reference whatever is made to his own death. Upon what ground, then, can the words, at his death, be interpolated? If he had even used the word "left" indefinitely, and not said when, it would have been a mere interpolation against his intent to insert, at or before his death, but where he purposely says, at the death of them, is there any just ground, any sound or reasonable rule of construction to nullify, or at least, render utterly useless, those words by inserting others?

Would not such a construction force a will or intent upon the testator merely because such an one would have been lawful? The second clause shows that he feared a disappointment of his views. *Redfield on Wills*, 481.

But what would be the conclusion from the premises of the appellees if that conclusion is admitted? Adopting their interpretation of the leasing clause with reference to the time of its duration, the appellants would remain entitled to an account of rents already accrued since the death of their deceased father, and to share in the rents to be realized in future by the exercise of that power. The claim as thus restricted is to be negatived only by showing that the rents were given to the testator's children absolutely.

And if we are right in our theory that "heirs *per stirpes*" in the first clause is used as "*designatio personarum*," and if the appellees are right in their theory, that the leasing

power is to be restricted in its exercise to lives in being at the time of the death of the testator, and a term short of twenty-one years thereafter, then the appellants, if living at the expiration of that term, or in the event of their death, their descendants living at that time, will become entitled to share in the distribution of the principal estate.

The conclusion from the whole therefore is:

1. That the appellants must show that the term, "heirs per stirpes," is a term of purchase and not of limitation, otherwise they fail altogether.

2. Succeeding in their first proposition, and adopting the theory of the appellees in relation to the duration of the leasing power, the appellants and their descendants are entitled to share in the fruits of the leasing power during its existence, and to share in distribution of the principal fund existing at the time of expiration of that power. This claim would rest upon the true construction of the first article expressed in reference to the rents, and implied in reference to the principal estate.

3. Upon the appellant's theory of construction of the first article, it is altogether inoperative in law, and the provisions of the second article apply. According to which the income of the estate was to be paid to the testator's children in equal shares during their lives, and on the death of Dr. Augustus Barnum the appellants succeeded absolutely to a child's part of the principal estate.

WEISEL, J., delivered the opinion of this Court.

The controversy in this case arises upon the construction of the will of the late David Barnum, of Baltimore, the founder and proprietor of the City Hotel of that city. It was executed on the 29th of August, 1843, with a codicil made on the 2nd day of September following. They were admitted to probate on the 13th day of May, 1844.

After a careful examination of these papers, as spread

out in the record, we can present the following as an analysis of them, by which their provisions will be the more clearly understood, and the intention of the testator more readily ascertained. The will and codicil alone furnish the facts in the statements which this analysis contains.

The principal part of his estate was the City Hotel buildings and grounds in the city of Baltimore, and the furniture and chattels in that hotel. To this part of his estate his entire will and codicil relate, with the exception of clause fourth, (save its concluding sentence,) and clauses fifth, sixth and seventh. The eleventh appoints executors, but they have duties to perform, in certain events, in relation to this property. The controversy is about this portion of his estate.

He had a family. A wife and children named in the will, among whom, and their representatives, in case of their deaths, the nett rents of the hotel were to be distributed, composed, as we may fairly conclude, the family he had in contemplation when he used the term.

He had debts to provide for, as therein declared. These were of two classes, a City Hotel stock debt and his general debts.

He undertook to make a disposition of this City Hotel property and furniture in a way which, in his judgment, would prove a sure and better resource for his family. In doing so, he did not forget or overlook his duty to his creditors of both classes; but whilst providing for his family from the rents and profits of the property, he primarily charged these with the payment of the regularly accruing interest upon the City Hotel stock, and of his general debts. He introduced this plan by an expression of a desire, at the beginning of the first clause of the will, that his City Hotel property in Baltimore should be permanently conducted, after his death, as a hotel, and of his

belief that the property thus employed would prove a sure and better resource for his family.

The plan is set out in the first, second, third, eighth, ninth and tenth clauses, and the last paragraph or sentence of the fourth clause of the will, and the entire codicil. These should be read together. The second clause refers to the first clause alone, as containing his views or plan ; but it is very manifest that the other clauses here specified and the codicil, would share the fate of the first, by the application of the second clause, whenever declared operative to disappoint those views.

Disregarding, then, at present, the second clause, and reading the other clauses above designated, and relating to this property, together, we discover his disposition of it to be this : He devised all his said hotel property, real and personal, to two trustees, his wife and his son, Ephraim K. Barnum, and the survivor and the survivor's heirs. By clause tenth, the continuance of the trust is provided for, in case of the death of both of said trustees. The property thus devised is described as "all the buildings of said City Hotel, and all the grounds thereof, and all the furniture, and all other chattels of said hotel, now or hereafter attached to it or used for it." The trusts are declared. The trustees were to lease the said property and apply the rents in a specified mode. With this view he divided the buildings, &c., into what he devoted to hotel purposes, and what he designed for other uses, calling or distinguishing the former as the hotel part of the property. The hotel part was not to "include any of the offices or apartments of the basement story of the City Hotel buildings, save only what was used for the lower bar and lunch-room of the hotel, and the apartments used for the culinary and other purposes of the hotel buildings." All else, including furniture and chattels, are denominated in the will as

"the hotel part of said buildings and grounds, furniture and chattels."

This hotel part the trustees were to permit Zenus Barnum and Andrew McLaughlin, (or one of them, if both would not agree to be tenants,) to use, occupy and enjoy as tenants, upon condition that they would conduct it as a hotel, and for the term of three years, at the yearly rent of ten thousand dollars, payable quarterly ; and if they, or either of them declined to rent it, or taking it, their tenancy should by any means be terminated, the trustees should, from time to time, during the period hereafter mentioned, lease the said hotel part for terms of years not exceeding ten years, for such yearly rent as his executors or administrators, with the will annexed, should approve, to any person who they should be satisfied would well conduct it as a hotel ; the rents under all the leasings to be primarily chargeable, in exoneration of all his other estate, real and personal, with the interest on the City Hotel stock and his general debts.

After deduction for the interest on the hotel stock and his debts, the trustees were directed to apply annually the rents of the said hotel part as follows : Three hundred dollars annually to his widow, in quarterly payments, in consideration of her ownership of a piece of ground constituting a part of the hotel premises, (with power in her to take possession of it and use or sell it, in case of default in any payment ; ) and of the residue, one-third to his wife for life, and the other two-thirds "in equal shares to and among his children and their respective heirs (*per stirpes*,) Eliza Stanard, Francis McLaughlin, Ephraim Kirby Barnum, Richard Barnum and Augustus Barnum ;" these children and their respective heirs in like manner being entitled at his wife's death to her one-third of the said rents.

The rents of the offices and rooms in the basement, not

included in the hotel part, he devised as follows : of room No. 4, to his daughter Frances McLaughlin and her heirs; of room No. 5, to his daughter Eliza Stannard and her heirs ; of room No. 6, to his son Richard Barnum and his heirs; of room No. 10, to his granddaughter Frances Waterman and her heirs; of room No. 9, to his grandson David McLaughlin and his heirs ; of room No. 11, to his son Augustus Barnum and his heirs ; of rooms Nos. 7 and 8, to Ephraim K. Barnum and his heirs, (in case the testator should sell the coal land devised to him in the 6th clause of the will ;) and of office No. 3, to Zenus Barnum *for his life.*

He directed that if the devise of the rents of said rooms 7 and 8, to his son Ephraim, should not take effect, they should be deemed part of the general residue of his estate ; and that the trustees should from time to time rent out said offices or rooms, or allow the same to be done by the respective devisees of the rents thereof.

By the 8th clause or article, a discretionary power is given to his executors or administrators, *c. t. a.,* to mortgage the City Hotel buildings, furniture and chattels, on such terms as they might deem expedient, to obtain money for paying his general debts, and then to set apart such portion of the rents of the hotel part of said buildings as they might deem expedient, for reducing the principal of the mortgage as well as paying the mortgage interest, either by way of actual payment to the mortgagees, or of a sinking fund to accumulate for the eventual extinction of the mortgage principal.

The proceeds of sales of his country seat, on the Harford turnpike, (4th clause,) are also charged with the payment of these debts in case the arrangement for the purpose, in the 1st clause, should prove impracticable, or if money could not be procured by mortgage as above. These two latter modes to be first availed of if practicable. The

tenants were to be bound to keep the furniture and chattels in good condition as delivered to them, and to replace such as should be lost or destroyed, or rendered useless by wear or tear, except by fire, against which risk the trustees were to keep the furniture and chattels insured in an amount deemed prudent, as also the said City Hotel buildings.

The period during which this leasing was to take place, and this trust to continue, was to be ''so long as his said children, or any children or descendants of them, or of any of them, left by them, or any of them, at the death of them, or any of them, shall live; it being understood that any lease made during the period aforesaid, shall have full effect and continue for its stipulated term, notwithstanding the cessation of all of said lives before the end of the term.''

We may observe here, though it may not be material in the examination of the questions before us, that the various provisions made for the payment of his general debts, do not interfere with the trust. That is still to subsist. If a mortgage were effected, these debts, by that means, would be consolidated and bind the hotel property in the hands of the trustees, and the rents would be made applicable by them to the consolidated debt and its interest, in the mode specified in the 8th clause, instead of in the way contemplated in the 1st clause or article. By this clause, the executors or administrators, *cum testamento annexo*, were to approve of the yearly rent for which the trustees were to lease the hotel part of the property, ( except that for the three first years to Zenus Barnum and McLaughlin.)

By the 8th article, the collateral power was conferred upon them to mortgage, if they deemed it expedient, the City Hotel buildings, furniture and chattels, to pay his said debts. They were the proper, legal parties to pay debts, and this may explain why the testator, in providing assets for the purpose, conferred upon them these powers of approval and control over the property. The hotel stock

debt, it seems, was to remain in its original form as a distinct, peculiar debt, the rents applicable to the interest only on it. His intention, however, appears to be, not to extinguish his general debts by applying *all the rents* of the hotel part primarily to that object, for his family was to be supported at the same time. If an annual partial application proved too slow, and creditors could not wait, then a mortgage could be resorted to. If that failed, or when made were passed to a foreclosure, then the avails of his country seat, on the Harford turnpike, should be brought into requisition for this purpose.

This, we consider, is the purport and reading of the will in the clauses mentioned respecting the City Hotel property, real and personal, and constitutes the testator's plan or views for permanently conducting the hotel during the period described, as a sure and better resource for his family, including a provision for the payment of his debts at the same time. For these the said property would have been legally bound by the testamentary and chancery laws of Maryland, a condition which its owner would not likely disregard or overlook in making a settlement for his family.

The first and very important question which arises on this statement of the contents of the will, and which has been most ably discussed at the hearing of this cause, is whether the period described in the will through which the leasing by the trustees is to run, transgresses the rule of law against perpetuities; whether it exceeds a life or lives in being at the testator's death, and twenty-one years and the allowed fraction of a year afterwards. That period is thus described : *"and the period during which my trustees and their heirs and successors shall have the power, and are required to lease as aforesaid, shall be so long as my said children, or any children or descendants of them, or of any of them, left by them, or any of them, at the death of them, or*

22    vol. 26

*any of them, shall live; it being understood that any lease* *made during the period aforesaid, shall have full effect and* *continue for its stipulated term, notwithstanding the cessation* *of all of said lives before the end of the term."*

It was very ingeniously pressed upon the Court by the counsel for the appellees, in the argument, that a fair philological examination of this sentence would confine the time within the rule; and that the word *left*, by assigning to it a past signification and allowing the will to speak as of the day of the testator's death, would indicate an intention to point to his own children, and children and descendants of children *living at the time of his own decease;* and that upon this construction the powers of the trustees would not, and were not, intended to endure beyond the lives of persons who should, at the moment of the testator's death, answer the description of children or descendants of children; in other words that descendants of children, *born after the death of the testator*, were not to be embraced within the continuance of the powers to lease; and that the word *"left"* is not of the same import in the will as if the language were, "may be left by them, (the children,) at the period of their (the children's) deaths, respectively."

But, we think, this clause will not admit of this interpretation. The participle *left* must have reference to and qualify the word with which it stands connected in the sentence, express or implied. And here the persons designated as *left* are the children or descendants of any of his children, and the time of *being left* is so plainly expressed that no doubt can well arise or be entertained, viz : *at the death of any of his said children.* If the testator meant otherwise, and intended to confine the time to his own death, he would not have resorted to phraseology so elaborate as that used by him, when the simple phrase of *living at my death,* would have at once conveyed his meaning. His own death, and the death of any of his children, are

two distinct events. He has used language plainly and distinctly, as we think, to express the latter. Upon what rule of construction then can it be applied to the former?

The time or period, therefore, for continuing this trust or power to lease the hotel property may extend so as to embrace persons and lives not *in esse* at the time of the testator's death,—descendants *born after that event.*

If an estate be so limited as by possibility to extend beyond a life or lives in being at the time of its commencement, and twenty-one years and a fraction of a year ( to cover the period of gestation) afterwards, during which time the property would be withdrawn from the market, or the power over the fee suspended, it is a perpetuity and void as against the policy of the law, which will not permit property to be inalienable for a longer period. The question whether an estate is a perpetuity, generally arises in cases in which a future contingent estate or executory devise is limited upon a fee, and if the contingency upon which the executory estate is to vest, is not necessarily to happen within the time fixed by the rule as the legal boundary, then the precedent estate or estates are denominated a perpetuity, and the executory estate or devise fails for want of a legal estate to support it. In all such cases, to give effect to the limitation over, the contingency *must* happen within the time prescribed by the rule. If it *may* happen after that time, then the preceding estate tends to a perpetuity, which the law abhors and forbids. The object of the rule is to prevent the tying up of property, real or personal, and rendering it inalienable longer than the period designated by it. For that time the power over the inheritance or absolute interest of property may be suspended, but no longer. *Lewis on Perp.*, 164, 165. 4 *Kent's Comm.*, 267, 271. 1 *H. & G.*, 116, *Newton vs. Griffith*, 7 *H. & J.*, 236, *Dallam vs. Dallam.*

In the case now under consideration, no question is pre-

sented as to the future vesting of an executory estate, in order to determine the validity of the preceding one; but simply whether the trusts of the will require in their execution a longer period than that prescribed by the rule against perpetuities, and, therefore, render the property devised to the trustees inalienable during that time. If so, the law denounces the devise in trust as a perpetuity, and declares it void.

We have already said, that such is the character of this devise; that the execution of the trusts for leasing the property and performing the duties enjoined upon the trustees is to cover a period beyond that allowed by law, during which time this hotel property, real and personal, is placed *extra commercium;* and that the devise in trust is therefore void.

If the trust be void, then the power to lease, which is blended with it, as in this case, must be void also. It is not a mere power distinct from the trust, leaving the act to be done at the will of the party to whom it is given, but it is mixed and blended with the trust, and its execution is as imperative as the trust itself. This distinction is well marked and to be observed. 2 *Sugden on Powers*, 158. In this case, the power is the trust, and the trust is the power. They cannot be separated, and any exceptions to the application of the rule, in cases of mere powers to sell or lease, do not apply to a case like this. The general principle is, that every power, the direct object of which is to create a perpetuity, is absolutely void. *Lew. on Perp.*, 486, and cases there cited. The exceptions to the rule, then, arise out of the distinction between general and limited or special powers. But in every case, the *execution* of the power, being distinct from the power itself, must conform to the requisition of the rule against perpetuities, or run the hazard of being avoided. And where a power is itself valid, in not transgressing the rule, the donee, in

executing it, may go beyond the proper boundary. Equity in such case, being guided by the power, will treat the excess as surplusage and void, but only where the portion which exceeds the boundary of perpetuity be definite and ascertained, or can be rendered so. But Mr. LEWIS, in his work, p. 494, adds, "that if the limitation under the power be read as inserted in the deed creating the power, (which he elsewhere observes to be the true rule by which to determine the validity of the limitation itself,) it is evident, that where a part of the appointment fails for excess, the whole must be involved in its fate, because such failure implies that all the interests created were not so given as necessarily to vest within the perpetuity line; and wherever such is the character of direct original limitations, they are wholly void for remoteness, notwithstanding actual events might enable some, or even all of them, to take effect within the required period." In the case under consideration, the limitation is in the instrument itself creating the trust or power, and no one can declare with certainty how the dispositions of the testator would have been regulated if he had been aware, at the time, of his inability to extend them to some included in his gifts. The whole is therefore vitiated by the excess. This is strengthened when we consider that this trust was created as a resource for his family, and to this end for permanently conducting the property as a hotel, the testator's idea of his family being itself a matter of much controversy and doubt.

These views may sufficiently dispose of that part of the argument, on behalf of the appellees, which labored to extricate the trust in this case from the effects of the perpetuity rule, on the ground that it did not apply to powers exercised as in this case, or if so, that the trusts would be declared good in equity, *pro tanto*, or to the extent of the rule.

The trusts being void *in toto*, we regard the legacies springing out of them to be void also. The power to lease being void, the right to share in the distribution of the rents, the fruits of the exercise of the power, must necessarily fail. *Coster vs. Lorillard*, 14 *Wend.*, 265, *et seq.* It is needless, therefore, here to inquire what estates the children of the testator took in these rents, under the phraseology of the will, so much discussed in the argument as bearing upon the testator's intention in the perpetuity clause, or as rendering the estates of the *cestui que trusts* free from its obnoxious effect, regarding them as fee-simple, equitable interests and alienable at the pleasure of those entitled.

If the clauses already referred to and analyzed with the residuary clause, constituted the entire will, the devise of the trust being void, the testator would be held to have died intestate of his hotel property. It would not pass by the residuary clause, under the rulings of this Court, in the case of *Tongue vs. Nutwell*, 13 *Md. Rep.*, 416.

But there is another and important clause or article in Mr. Barnum's will which is yet to be considered, and under which the complainants, the appellants, claim in this case. The testator's intention in that article is to be inquired into and effect given to it consistently with the rules of law.

Upon its construction and effect this Court do not entirely agree, as they have concurred in the preceding part of this opinion. A majority of the Court, however, have, after a careful examination of the second article in connexion with all the other portions of the instrument, arrived at the conclusion that the testator intended by it an alternative provision in case his views expressed in the first article should be disappointed by any cause which would lead to a sale of the City Hotel buildings or grounds in the lifetime of any of his children. The language of the article is: *"should my views in the above first article of this will be disappointed, so that judicially or otherwise a sale shall take*

place of said *City Hotel buildings and grounds during the
life of any of my children, it is my will, and 1 direct that
my trustees, or any Court of Equity, shall cause the proceeds
of sale to be invested in mortgage or in ground rents*," &c.

It is apparent from the other parts of his will, that the
testator's principal object was a family settlement in regard
to the main and favorite part of his estate. The various
and complicated provisions of the instrument, constituting
almost its entire contents, are devoted to this purpose. He
devised a mode for perpetuating it and for working out
through its means a provision for the liquidation of his
debts, and the support of his family through all the gene-
rations of his descendants, and providing for a correspond-
ent continuation of the trust beyond the lives of those
named as trustees in the will, by his executors and admin-
istrators *cum testamento annexo* to be appointed.

Although the third and other articles of the will stand
necessarily in connexion with the first, it is the first that
embodies the main features of the settlement. It names
the trustees, the period of the trust, the *cestui que trusts,*
the trusts themselves, with other guards and provisions for
their safe and continued execution. His views may there-
fore be said to be contained in the first article, though in
fact the other articles also embrace portions of them.

It was contended by the counsel of the appellees, with
plausibility and force, that this second article was not
intended to go into operation unless a sale of the buildings
and grounds of the hotel should judicially or otherwise
take place against the testator's will, and not until and
after such a sale had taken place, and as a condition pre-
cedent, and that his motive in introducing it was *in terrorem*
to prevent the destruction of the trust by any of his children,
who in such event should receive only life estates in the
proceeds. And as no such sale has taken place, the clause
itself is and remains inoperative, and the bill of the com-

plainants has been prematurely filed ; that the contingency or event upon which another and different disposition of the property is to take effect has not happened, and there-fore no rights under it have accrued or can be asserted.

The testator might reasonably be supposed to provide some mode for securing a cherished plan, and rendering it completely operative. But if this were the motive for the insertion of the second article, why hold the rod over his children, when grandchildren, descendants of a deceased child, might effect the same interruption, tempted too by the absolute possession and enjoyment of the proceeds of sale ?

It is impossible to say what was the governing motive of the testator in inserting this second article. He may as reasonably, if not more so, have looked forward to a probable sale of the hotel, during. the life of some one of his children, five in number, even if he was not aware that he had violated the rule against perpetuities, and thereby rendered the first article void and inoperative. He owed debts for which the urgent demands of creditors might render a mortgage of the hotel expedient, a prior plan ; for the proceeds of the country seat were to be postponed to this. A mortgage effected might in time be pressed to a foreclosure or sale. The stockholders might determine upon a sale of the property to pay the certificates of stock. Other events might occur to render a sale necessary, and therefore the word *otherwise* was introduced to embrace any kind of sale. But inasmuch as the testator, in this article, looks only to a sale of the realty, the hotel buildings and grounds, omitting all notice whatever of the personalty, the furniture and chattels, (no small portion in value or amount of the property devised in trust in so large and extensive an establishment,) the inference is strong, if not irresistible, that he had in contemplation a probable sale resulting from a failure of the first article by reason of

its invalidity. In such an event, the personal property would be applicable to his debts without any special provision for that purpose. The establishment could no longer be conducted as a hotel upon his proposed plan, and as a support for his family ; and the next best thing, looking to a sure provision for not only his children, but their children and descendants, he directs the investment of the proceeds of the sale of the buildings and grounds in mortgage, ground-rents, United States or city of Baltimore stocks, for the benefit of his children during their lives, (subject to one-third of the income of the investment to his wife during her life,) and after their death to be the property of their respective children or descendants *per stirpes;* the children of such of his children as shall have died before the investment, taking as their absolute property and *per stirpes*, the shares to which, if they had lived, the deceased children would have been entitled.

If the first article should prove inoperative by the rules of law, and the testator apprehended it, what more likely than to provide in his will a substitute or alternative disposition of the estate. The presumption is, that making a will, he did not design to die intestate of any portion of his property, particularly of that which constituted his principal estate, and which he was seemingly so careful to dispose of for the benefit of his family and creditors. In doing so he would not likely ground his bequests upon an actual precedent sale as a condition, when a state of things might arise leading to a sale, or proceedings be instituted that would result in one. In either or any of these events, his views, as contained in the first article, would be equally disappointed.

It is to be noted, too, that the testator speaks in the future tense, "a sale shall take place," not in the second future, "a sale shall have taken place." The meaning is

the same as if he had said, "so that judicially or otherwise a sale *is to take place.*"

If the theory of the appellees be correct, and any of the *cestui que trusts* in the first article, taking an equitable estate in fee, in the premises, should sell his interest, ( as has been done in this case,) and then a sale of the hotel buildings and grounds should take place in the lifetime of some of the children, for a cause other than that of the invalidity of the trust in the first article, how could the testator's directions, as to the investment of the fund, take place for the life of the children, and after their death absolutely to their descendants ? This conflict can only be reconciled upon the ground that the children and other legatees were to take life estates in the rents under the first and third articles, and that they had no disposable owner-ship in the property itself. If the testator's views in the first article should then be disappointed, and a sale take place, his intentions as to the proceeds could then be car-ried out under the second, in which life estates are expressly given to all the children, with remainders to the grand-children or descendants *per stirpes*.

Equity treats as done that which ought to be done. If, upon the failure of the first article, parties became entitled to the proceeds of sale when effected, they would have a right to resort to a Court of Equity for a sale which would produce those proceeds. In substance, the will is the same as if it directed a sale to take place in case the views in the first article could not be carried out, and it would seem the testator supposed that the trustees would have the power to make the sale. What else could he have meant by the language : "I direct *my trustees or any Court of Equity* shall cause the proceeds to be invested," &c., agreeing with the previous branch of the sentence, "so that *judici-ally or otherwise,* a sale shall take place ?" A sale by the trustees would not be a judicial sale, as would be one under

an order or decree of a Court of Equity, which could only be obtained after proceedings instituted and conducted for the purpose.

But we must not be understood as saying that the trustees have the power to make the sale under this will, as the testator has failed to use language sufficient, in our judgment, to confer it.

The first clause of the will of the testator being void, and his purposes therein declared having been disappointed, the second clause becomes operative, and the complainants are entitled to relief. It, therefore, follows, that the Court below erred in dismissing the bill. The decree appealed from will therefore be reversed, and the cause remanded for further proceedings; the costs in this Court and the Court below to be paid out of the trust fund.

*Note.*—This cause was heard before the full Court, but the opinion was not filed until after the death of Justice COCHRAN; he however concurred, in consultation, with the views of the majority. BOWIE, C. J., dissented.