SAFE DEPOSIT & TRUST COMPANY, TRUSTEE, *v.* JOHN M. SHEEHAN ET AL.

*JOHN M. SHEEHAN* ET AL. *v.* SAFE DEPOSIT & TRUST COMPANY, TRUSTEE

[Nos. 33, 34, April Term, 1935]

94

*Decided June 18th, 1935.*

The causes were argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Walter L. Clark* and *Roszel C. Thomsen,* for the Safe Deposit & Trust Company.

*Joseph S. Knapp, Jr.,* for John M. Sheehan and others.

OFFUTT, J., delivered the opinion of the Court.

Michael Sheehan, late of the City of Baltimore, died on March 5th, 1923, leaving to survive him a son, John M., and five grandchildren, the children of John M., namely, Michael, born October 3rd, 1909, John Marr, born October 5th, 1911, Mary Chester, born April 28th, 1913, Joseph Chester, born June 17th, 1915, and James Carroll, born October 2nd, 1919, and two sisters, Mary and Johanna. He was also survived by Ellen C., the wife of his son, John M. Sheehan.

He left a valid will, which, with two codicils thereto, was admitted to probate in the Orphans' Court of Baltimore City on May 23rd, 1923. At the time of his death

he owned and possessed a large estate, which included real and personal property, which he undertook to dispose of by that will and the codicils thereto.

After making the customary provisions for the payment of debts and administration expenses, and after providing for several charitable legacies, the will, in a paragraph designated "Item V," attempted to dispose of the entire residuum of the estate. The purpose of this proceeding is the construction of that clause or item, mainly to ascertain whether it or any part of it violates the rule against perpetuities.

By it he gave the residuum of his estate to the Safe Deposit & Trust Company of Baltimore in trust, and in it, after conferring upon the trustee the powers necessary to execute the trust, and providing for annuities to his sisters and his son, he further directed the trustee:

"(4) To pay unto Ellen C. Sheehan, the wife of my said son, John M. Sheehan, the annual sum of twenty-five hundred ($2,500) in equal quarterly installments, to be used by her for the maintenance and support of herself and the children of my said son, living at that time. From and after her death, to pay the said annual sum of twenty-five hundred dollars ($2,500) unto the children of my said son, John M. Sheehan, living at that time, in equal shares, equally, the child or children of any deceased child or children to stand *in loco parentis* and take *per stirpes* and not *per capita* until the eldest of said children of my son, John, shall have arrived at the age of twenty-five years.

"Notwithstanding anything herein contained to the contrary, should my said son, John M. Sheehan, die before his wife, and should she remarry, I hereby authorize and direct my Trustee to expend the said sum of twenty-five hundred dollars ($2,500) to which Ellen C. Sheehan * * * would have been entitled to receive had she not remarried, for the maintenance and support of the children of my said son living at that time, until the eldest of said children shall have arrived at the age of

twenty-five years, the child or children of any deceased child or children to take the share to which their parents so dying would have been entitled if living, *per stirpes* and not *per capita*.

"(5) All of the balance of the net annual income, after the payment of the above annuities, shall be by my Trustee invested, and the same shall become and be a part of the corpus of my trust estate.

"From and after the death or remarriage of Ellen C. Sheehan, * * * whichever event shall first occur, and upon the arrival of the eldest child of my said son at the age of twenty-five years, I hereby authorize and direct my Trustee to divide the corpus of my trust estate, as the same may then be constituted, into twice as many parts as there may be children of my said son then living, the child or children of any deceased child of my said son to stand *in loco parentis per stirpes* and not *per capita*.

"(a) To convey, assign, transfer and deliver one of said equal parts unto each child as the same shall arrive at the age of twenty-five years, freed, cleared and discharged from the trust hereby thereon imposed, the child or children of any deceased child or children to stand *in loco parentis, per stirpes* and not *per capita*, and to receive the share of their parent when and at the time their parent, so dying would have been entitled to receive the same, if living.

"Notwithstanding anything herein contained to the contrary, it is my will and desire, and I hereby authorize and direct my Trustee that during the interval between the time when the eldest child of my said son shall arrive at the age of twenty-five years, and the time when the youngest of said children shall arrive at the age of twenty-five years, each of said children not so having arrived at the age of twenty-five years shall be entitled to receive the income derived from those portions of the corpus of my trust estate which each respective child shall be entitled to receive upon the arrival of each respective child at the age of twenty-five years, as hereinbefore

provided, the child or children of any deceased child or children, to stand *in loco parentis, per stirpes* and not *per capita;* and should any of the children of my son John depart this life before reaching the age of twenty-five years, without leaving a child or children him or her surviving, then the one equal part which would have been payable to him or her upon arriving at the age of twenty-five years, shall go to and be distributed to my descendants living at his or her death, *per stirpes* and not *per capita,*, freed, cleared, and discharged of the trust hereby created.

"(b) To hold the remaining portions of my estate in further trust and confidence, however, to pay the net annual income therefrom derived, unto such of the children of my son John and the descendants of his deceased children, *per stirpes* who may be living from time to time, as such income is received by my trustee; and upon the death of the last surviving child of my said son John in further trust and confidence to divide the corpus of my trust estate, and to convey, assign, transfer and deliver the same, as it may then be constituted, between and among the descendants of my said son, John, living at that time, said division and transfer among said descendants, however, to be made *per stirpes* and not *per capita,* and when so made, said descendants shall thenceforth hold the same, freed, cleared and discharged from the trust hereby thereon imposed."

The only effect of the codicils was to increase the amount of the charitable legacies, and to increase the amount of the annuities to his sisters and his son, and they do not affect the consideration of any question presented by the appeal.

On June 13th, 1923, John Sheehan and others filed in the Circuit Court of Baltimore City against the trustee named in the will, which was also the executor named therein, the bill of complaint in this case, in which they asked that court to assume jurisdiction of the trusts created by the item just quoted, and to supervise their administration. As the result of further proceedings,

that court did assume jurisdiction of the trusts, and on March 8th, 1935, the trustee filed in the case a petition alleging that Ellen C. Sheehan had died April 7th, 1930; that Michael Sheehan, eldest son of John M., had reached the age of twenty-five years; that the other four children of John M., who were all living at the testator's death, survived; that John M. had not remarried, and had no other children or descendants; and that Michael, the grandson, had demanded that the trustee deliver to him the share bequeathed and devised to him absolutely upon his arrival at the age of twenty-five years.

It further alleged that, in the event that Michael Sheehan, the testator, died intestate as to any part of his estate, it would devolve upon John M. Sheehan, his son and sole distributee and heir at law; that on December 31st, 1934, John M. Sheehan, subject to the payment of an annuity of $2,500 to him, by deed of that date granted to the Safe Deposit & Trust Company any and all right, title, and interest which he had or might have in the estate of Michael Sheehan, his father, in trust to set aside a sufficient sum to yield $2,500 per annum during his life and to maintain the Park Avenue property, to permit him to occupy that property, and to pay him the annuity, to set aside $100,000 to pay a possible gift tax, and eventually to distribute the estate as directed in the deed. Either under the deed of trust or under the will, Michael Sheehan, the grandson, upon arriving at the age of twenty-five years, became entitled to receive one of the ten shares into which the trustee, both by the will and the deed, was required to divide the estate upon the occurrence of that event, and it accordingly apportioned, and was prepared to pay, one of said parts to the grandson Michael.

Upon that petition the trustee asked the court (1) to construe the will and codicils of Michael Sheehan to determine whether any provision thereof violated the rule against perpetuities, and to instruct it as to the division of the estate into shares and with respect to the disposition thereof; (2) to ratify its action in setting

aside $100,000 to pay the annuity to John M.; (3) to authorize it to pay to Michael, the grandson, certain cash and securities apportioned to him as the share to which he became entitled when he arrived at the age of twenty-five years, pending the ultimate construction of the will and codicils; (4) to direct it as to the distribution of the income pending such construction; and (5) for general relief.

As a result of further proceedings, the court on March 26th, 1935, decreed (1) that the provisions of item V, section (5), subsection (a), were valid; (2) that the provisions of item V, section (5), subsection (b), violated the rule against perpetuities and were invalid; (3) that the acts of the trustee in setting up a fund for the payment of the annuity to John M. were approved, and the trustee authorized to pay the annuity from income or corpus as might be required; (4) that John M. and his family be permitted to occupy the Park Avenue property; (5) that the act of the trustee in setting aside a fund for the payment of taxes and expenses, one-half of any balance of such fund to be distributed eventually as directed in item V, section (5), subsection (a), and the other half as directed by the deed of trust, be approved; (6) that one-half the corpus of the estate as of October 3rd, 1934, be held and distributed under item V, section (5), subsection (a) of the will; (7) that the other half be distributed as directed by the deed of trust; (8) that the division of the corpus as of October 3rd, 1934, be approved; (9) that under the will the trustee be authorized to pay to Michael, the grandson, the cash and securities apportioned to him under said subsection (a); (10) that the trustee under the will be authorized to pay income from the respective shares as fixed by the division, pending an auditor's account; (11) that the trustee be authorized and directed to enter an appeal from the decree.

From that decree the Safe Deposit & Trust Company, trustee under the will, took the appeal in No. 33, and John M. Sheehan, his children, and the Safe Deposit &

Trust Company, trustee under the deed, took the appeal in No. 34. The parties to both appeals apparently agree that the ruling as to subsection (a), section (5), item V, is correct, but the appeal in No. 34 was taken that the legal principles involved in that ruling might be reviewed and stated by this court also, while in No. 33 the trust company suggests that the ruling that subsection (b) of section (5), item V, violates the rule against perpetuities is erroneous. To the extent that the provisions of section (5) are valid, they will be administered under the will; to the extent that they are invalid, they will be administered under the deed of trust. If subsection (b) is invalid, rights of unborn children and grandchildren of John M. Sheehan sought to be created by it fall, and the extent to which the estate disposed of by section (5) will be subject to the federal gift tax is the extent to which it passes under the will, or under the laws of descent and distribution.

So that the two questions presented by the appeal are: Do the provisions of subsection (a) or of subsection (b) violate the rule against perpetuities?

Before attempting to state and apply the law affecting the facts out of which those questions arise, the several contingencies which may determine the devolution of the property described in subsection 5 will be noticed in their relation to such lives in being at the testator's death and for twenty-one years and the ordinary period of gestation after the termination of such lives, as he selected to determine the extent, the commencement, and the end of the estates which he attempted to create.

*Classification and division of the corpus.* Upon the death or remarriage of Ellen C., and upon the arrival of the eldest son of John M. at the age of **twenty-five,** the trustee was directed by item V to divide the estate into twice as many parts as there were children of John M. then surviving. Since Ellen C. was living at the testator's death, and the eldest son of John was then more than thirteen years old, that event must of necessity

occur within a life or lives in being at the death of the testator and twenty-one years thereafter.

*Distribution under section (5), subsection (a).* The trustee was then directed to transfer one of said shares to "each child" as the same should arrive at the age of twenty-five years. It was possible, of course, that the youngest child of John M., alive at the time of the division of the estate into shares, might be born after the death of the testator, but it must of necessity have been born in John's lifetime or within the ordinary period of gestation thereafter. But if it was born immediately prior to the division of the estate into shares, and John and Ellen C. had both died before or immediately after that event, such child would not reach the age of twenty-five until more than twenty-one years and nine months after the end of those lives. If, however, the testator intended to limit the class to the children of John living at the time of his death and also living at the time of the division of the estate into shares, the entire five shares would be transferred to the donee within twenty-one years and nine months after the termination of a life or lives in being at the death of the testator, for at that time the youngest child of John M. living at the time of the division of the estate into shares was three years and four months old, and it must reach the age of twenty-five within twenty-one years and nine months after the death of both John M. and Ellen C., whenever those events might occur.

Finally the trustee is directed, in the event of the death of "any" child of John before the age of twenty-five without leaving a child or children him surviving, to distribute the "one equal part" which would have been distributable to such child, to the "descendants" of the testator. It was possible that such "descendants" might be born after the death of the testator, and if he intended that the property should be divided among the children of John whether living or not at the testator's death, it was possible that a child might be born to John who would not reach the age of twenty-five until more than

twenty-one years and nine months after the death of John, in which case there might be descendants of the testator who would not have been born within a life or lives in being and the usual period of extension. If he intended to divide the estate only among those children of John living at the time the estate was divided into shares, nevertheless, it was possible that one of those children might not reach the age of twenty-five years until more than twenty-one years and nine months after a life or lives in being, and that the testator might have descendants not born within that period.

*Distribution under section (5), subsection (b).* The trustee was further directed, after the death of the last surviving child of John, which may not be until more than twenty-one years and nine months after the death of John, to distribute the remaining five shares to John's "descendants," "living at that time," *per stirpes, etc.*, although such descendants might be born more than twenty-one years and nine months after the end of both lives by which the duration of the trust was measured.

The rule against perpetuities is judge made law. In its modern form it was first announced in the *Duke of Norfolk's Case,* 3 Ch. Cas. 27, which marked a definite stage in a long struggle between the great landowners of England who sought the power to so tie up their land that no future owner "would have complete power of alienation," and the courts, which sought to preserve freedom of alienation as a principle of the common law, a struggle which raged intermittently from a very early period of the common law until comparatively modern times. *Holdsworth, History of English Law,* vol. 7, p. 195 *et seq.* But as the dangers inherent in the recognition of a power to withdraw property from commerce for remote and indefinite periods lessened, so the attitude of the courts to the right of donors to impose restraints upon alienation in order to protect objects of the donor's solicitude or interest changed, and greater weight was given to the donor's intention, so long as the execution of that intention involved no real danger of a perpetuity.

So, while formerly the test was the period for which the estate might endure beyond a life or lives in being and twenty-one years (with an allowance for the period of gestation, when necessary), the test now universally recognized is whether it will vest within that period. *Id.,* 216, *Miller, Construction of Wills,* sec. 314 *et seq.; Tiffany on Real Property,* sec. 179. In the *Duke of Norfolk's Case, supra,* the Earl of Arundel conveyed lands to trustees for a term of two hundred years in trust for Henry Howard, his second son, but if Thomas Howard, his oldest son, died without issue male in Henry Howard's lifetime, or if the earldom should descend to Henry, then in trust for Charles, his third son. Thomas died without issue, and Henry had procured an assignment of the term and suffered a common recovery for the use of him and his heirs. The question was whether the executory trust in favor of Charles was barred by the recovery, which depended upon whether it was too remote and therefore void. Upon those facts Lord Nottingham, overriding three common law judges who sat with him, held the trust valid, and in one of the great opinions of English law "laid down the root principle of the modern rule against perpetuities—the validity of an executory interest depends upon the remoteness of the date at which it is limited to vest. It also clearly lays down the principle, which was assumed in the earlier cases on executory interests, that, in considering the validity of a limitation, possible and not actual events must be considered. 'If a term be limited to a man for life, with contingent remainders to his first, second, third and tenth son in tail, remainder over, though the contingencies never happen, yet the remainder (over) shall never take place, for the mere intention to create a perpetuity made all void.' " *Holdsworth's History of English Law,* page 225. And the same author says: "He applied to the solution of this question all his great gifts of law and statesmanship; and, as we shall now see, he stated that principle so clearly that, in spite of the dissent of the common law judges and of his successor, it commanded the

assent of the House of Lords and of all the lawyers of future ages. In his judgment we get the first authoritative statement of the principle underlying the modern rule against perpetuities." Prior to that case, it had been held in *Taylor v. Biddall*, 2 Mod. 289, that an executory devise to the heirs of a living person when they attained the age of twenty-one years was good; other extensions were established in *Gore v. Gore*, 2 P. Wms. 65, *Staines v. Maddox*, 3 Bro. P. C. 108, *Lloyd v. Carew*, Prec. Ch. 72, until finally in *Cadell v. Palmer*, 1 Cl. & Fin. 72, it was decided that a "gross term of twenty-one years, without reference to any period of minority, might be taken, with the addition, when necessary, of the period of gestation." *Holdsworth's History, Eng. Law*, 227. And so the rule now stands.

The rule formerly recognized in this state was stated by Professor Venable in his *Syllabus on Real Property*, p. 84, as follows: "Where a trust is created which may continue beyond a life or lives in being and twenty-one years and a fraction thereafter, it is void as infringing the rule against perpetuities (*Deford v. Deford*, 36 Md. 168; *Barnum v. Barnum*, 26 Md. 119). * * * If upon an inspection of the instrument creating the limitation it appears that the event on which the future interest is to take effect may by possibility not happen in the prescribed time, then such limitation is void. It makes no difference if it afterwards actually occurs in the prescribed time, or that it is eminently probable that it will so occur." In that form the rule, which was in conflict not only with the *Duke of Norfolk's Case, supra,* but with practically the uniform and unbroken trend of modern authority both in England and America, was announced in *Barnum v. Barnum,* 26 Md. 119, 169-172, where the court said that "if an estate be so limited as by possibility to extend beyond a life or lives in being at the time of its commencement, and twenty-one years and a fraction of a year (to cover the period of gestation) afterwards, during which time the property would be withdrawn from the market, or the power over the fee

suspended, it is a perpetuity and void as against the policy of the law, which will not permit property to be inalienable for a longer period." That case was followed by *Deford's Case*, 36 Md. 168, but as pointed out in an exhaustive note by Judge Eli Frank to Perkin's Edition Md. Reports, vol. 26, p. 119, note 3, it was supported neither by the text-writers nor the cases, and was finally overruled in *Gambrill v. Gambrill*, 122 Md. 563, 568, 89 A. 1094, 1095, where Judge Urner for this court stated the rule as it is now established in this state in the following words: "The question we have to decide is to what extent, if at all, this disposition of the estate contravenes the rule against perpetuities. The object of the rule is to prevent the limitation of estates for future vesting upon contingencies which are not certain to happen within the period of a life or lives in being when the instrument making the disposition takes effect, and twenty-one years beyond, with an additional allowance of time for the possible birth of a posthumous child. *Dallam v. Dallam's Lessee*, 7 H. & J. 220; *Newton v. Griffith*, 1 H. & G., 111; *Biscoe v. Biscoe*, 6 G. & J. 232; *Barnum v. Barnum*, 26 Md. 119, 171; *Heald v. Heald*, 56 Md. 300; *Starr v. Starr M. P. Church*, 112 Md. 171, 182, 76 A. 595; *Hollander v. Central Metal & Supply Co.*, 109 Md. 131, 157, 71 A. 442; *Graham v. Whitridge*, 99 Md. 248, 57 A. 609, 58 A. 36; *Levenson v. Manly, supra* [119 Md. 517, 87 A. 261.] The rule is applicable to limitations of either legal or equitable estates in either real or personal property. *Graham v. Whitridge; Biscoe v. Biscoe, supra;* 1 *Perry on Trusts*, secs. 378, 382. It relates to the commencement of future interests, and not to their duration, and it is therefore immaterial whether the estate limited is in fee, for life, or for years, provided the event upon which the limitation depends is certain to occur within the period which the rule defines. *Heald v. Heald; Hollander v. Central Metal & Supply Co.; Graham v. Whitridge, supra;* Lewis on Perpetuities, 460, 461; *Jarman on Wills*, 340; 1 *Perry on Trusts*, sec. 380; 1 *Tiffany on Real Property*, sec. 152; *Gray on Perpetuities*, sec. 232."

That statement of the rule was approved in *Turner v. Safe Deposit & Trust Co.*, 148 Md. 371, 376, 129 A. 294, and may be accepted as settled law.

In determining the applicability of those principles to the language of a will or deed, other principles more or less mechanical in their nature may be invoked, as that effect should be given to the intention of the donor where that may be done without violating any rule of law or public policy *(Hutton v. Safe Deposit & Trust Co.,* 150 Md. 539, 554, 133 A. 308; *Ridgely v. Ridgely,* 147 Md. 419, 128 A. 131), that where such a conclusion may be reached consistently with the language of the will, it will be presumed that the testator did not intend to die intestate as to any part of his estate where the will contains a residuary clause *(Miller, Construction of Wills,* sec. 58), that the law favors the early vesting of estates, *(Pocock v. Gladden,* 154 Md. 249, 256, 140 A. 208), and that, where the language under consideration is open to more than one construction, that will be favored which sustains the validity of the will over one which will destroy it, unless such a construction is contrary to the testator's intention as manifested by the language of the entire will. *Miller, Construction of Wills,* sec. 13.

So that the ultimate question in the case is: When did the interests or estates created by item V vest? The word "vest," as used in the law of property, signifies the fixation of a present right to the immediate or future enjoyment of property. *Bouvier, Law Dictionary; Oxford Dictionary; Words and Phrases,* First, Second, Third and Fourth Series. The testator apparently intended (1) to provide for the payment of certain annuities to his two sisters and his son during their respective lives and to his son's wife for life unless John died and she remarried, and at the death or remarriage of Ellen to divide her annuity among John's children annually until the oldest reached the age of twenty-five; (2) to provide that all income from the estate not needed for the performance of those and other antecedent directions of the will should accumulate until the occurrence of two

events, the death or remarriage of Ellen and the arrival of the oldest son of John at the age of twenty-five, and then to constitute part of the corpus of the estate with which the trustee was directed to deal as of that time. When that time arrived, the trustee was directed to divide the corpus into twice as many parts as there were children of John "then living," the children of a deceased child to represent and stand in the place of the parent, and to distribute to "each child" or its representative child or group of children one of such shares "as the same" arrived at the age of twenty-five years.

From those directions it should be inferred that the testator intended to create, as of the date of the division of the estate into shares, a class composed of his children then living and the children of those who had died leaving children, and that the right of each child then living, and the children of those who had died leaving children then surviving, considered as a group or unit in the stead or place of the deceased parent, to receive one of these shares as each reached or would, if living, have reached the age of twenty-five, would become fixed and immediate as of that time, although the right might not ripen into enjoyment until more than twenty-one years and nine months after the death of both John and Ellen. It is true that if the ultimate limitation over of the share of a child dying without children before twenty-five is valid, the amount which each member of the class, considering children of a deceased child as one member, would receive is uncertain, in that it might be increased by the distribution of such share, but in any event its minimum value must be fixed at the time of the division of the estate into shares. John's oldest son, Michael, would necessarily reach twenty-five within twenty-one years after the testator's death, so that the time for fixing the membership of the class was not too remote. *Gray on Perpetuities, secs.* 639aa, 322; *Tiffany on Real Property,* p. 600. And in *Gray on Perpetuities,* sec. 379, it is said: "Whenever a gift is made to such children, or members of some other class, as reach a certain age, the class is closed

when one member of it reaches the required age; no after-born person can be included in it." 2 *Jarman on Wills,* sec. 1015.

But it is further provided that if any of the children of John should die before reaching twenty-five without leaving a child or children to survive him, the part which would have been distributable to the child so dying had it reached that age shall be distributed to the testator's descendants living at the time of the death of such child. Since a child might have been born to John immediately before the class closed, and he (John) might have died immediately thereafter, it was possible that a member of the class might live more than twenty-one years and nine months after the death of the survivor of John and Ellen, but die before reaching twenty-five, so the limitation over of the share or part of that child to the testator's descendants would violate the rule. But it is said in *Gray on Perpetuities,* sec. 247: "If future interests created by any instrument are avoided by the rule against Perpetuities, the prior interests become what they would have been had the limitation of the future estates been omitted from the instrument. Thus, if an estate is given to A. for life, remainder to his children and their heirs, but, if the children all die under twenty-five, then to B. and his heirs, the limitation to B. is too remote, and the children of A. take an indefeasible fee simple. The cases illustrating this are innumerable." See, also, section 249; *Miller, Construction of Wills,* sec. 329; *Turner v. Safe Deposit & Trust Co.,* 148 Md. 371, 376, 129 A. 294; *Gambrill v. Gambrill,* 122 Md. 563, 570, 89 A. 1094; *Graham v. Whitridge,* 99 Md. 248, 281, 57 A. 609, 58 A. 36.

The second block of five shares, constituting one-half of the estate, is under subsection (b) to be held until the death of the last surviving child of John, and then to be distributed to a class composed of the descendants of John living at that time, the division to be made *per stirpes.* It was, of course, possible that John might have a child born after the death of the testator, who might not die until more than twenty-one years and nine months

after John's death, in which event the estate would be distributed to persons not born within a life or lives in being at the testator's death, nor within the measure of time fixed by the rule thereafter.

For reasons stated above in respect to subsection (a), the class closed upon the death of the last surviving child of John. The devise and legacy was clearly to the class, and until the time came to close it, the number and the identity of those who would compose it remained uncertain and contingent. No one could therefore be said to have any vested interest in the property until then, for the value of each share and the number of persons among whom it would be divided must remain uncertain until then, nor can the interest of any person, eligible to become a member of the class, be said to be fixed, certain, or vested until the class is closed at the death of the last surviving child of John. Since the last surviving child of John may not die until more than twenty-one years and nine months after a life or lives in being at the death of the testator, the provisions of that subsection violate the rule against perpetuities, and are void.

These were the only two questions argued in this court, and since we concur in the conclusions reached by the learned chancellor in respect to them, the decree appealed from will be affirmed.

*Decree affirmed, with costs.*

PARKE, J., dissents.